# SUPREME COURT.

MAURICE LANERGAN, plaintiff in error, agt. THE PEOPLE, defendants in error.

The court of general sessions of the city and county of New York, have the power to grant new trials upon the merits and on the ground of newly discovered evidence. The act of 1859 (*Laws of* 1859, *ch.* 339, § 4), which grants to the courts of "sessions of the several counties of the state, the power to grant new trials, extends to the court of general sessions in the city and county of New York.

A prosecuting officer cannot be compelled to elect upon· which count, in an indictment for homicide, he will ask a conviction, the indictment containing several counts, alleging a killing in three different ways. A general verdict of guilty is not repugnant, inconsistent or void.

Construction of the act of April 12, 1862, as· to what constitutes the difference between the two degrees of murder.

Premeditation proves a malicious intention when applied to a homicide, and when the killing occurs with an intent to effect death, however instantaneously, the intent is formed prior to the commission of the deed.

The legislature intended the application of the term "premeditated" to an intent formed on the instant of killing.

Intoxication must result in a fixed mental disease of some continuance or duration, before it will have the effect to relieve from the responsibility for crime.

*First District, General Term, December*, 1867.

*Before* LEONARD, *P. J.;* SUTHERLAND *and* CLERKE, *Justices.*

WRIT OF ERROR. The plaintiff in error, Maurice Lanergan, was indicted in the court of general sessions of the city of New York, for the murder of his wife, on the 26th of March, 1866. At the June term of the court, 1866, before the Hon. JOHN K. HACKETT, recorder, the plaintiff in error was brought to trial upon the indictment, and was convicted of murder in the first degree, and sentenced to be executed upon the 9th day of August, following. A writ of error and stay of execution was allowed. The facts and points will fully appear in the opinion of the court.

WILLIAM F. KINTZING, *for plaintiff in error.*

The prisoner was indicted for murder, and tried in the court of general sessions of the peace, in and for the city and county of New York, on the 13th, 14th and 17th days of June, in the year 1866, was convicted and sentenced to death; proceedings were stayed in consequence of the allowance of a writ of error and stay of execution by this honorable court.

I. The court erred in refusing to charge, as requested, upon following propositions of law:

1st. "That in order to constitute murder in the first degree, the premeditation must have existed prior to the immediate occurrence which resulted in death."

2d. That, if upon a sudden quarrel or meeting between parties, one kills another designedly and with malice, there being no previous deliberation, it is the duty of the jury to treat such as a case of murder in the second degree.

Counsel for the prisoner requested the recorder to charge the jury in the affirmative upon the above mentioned propositions of law, in order to put a construction on the act of April 12, 1862, as to what constituted murder in the second degree, the above being the true and proper distinction between murder in the first and second degree, as contended upon the trial of this cause.

The act of April 14th, 1860 (*Sess. Laws, p.* 712), since repealed, enacted, "all murder which shall be perpetrated by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing, or which shall be committed in the perpetration of, or the attempt to perpetrate any arson, rape, robbery or burglary, or in any attempt to escape from imprisonment, shall be deemed murder of the first degree, and all other kinds of murder shall be deemed murder of the second degree." * * * *

§ 3. "Upon any indictment against any person for murder in the first degree, it shall and may be lawful for the jury to find such accused person guilty of murder in the second degree." Murder in the first degree, only was punishable with death. The act of 1860, was repealed by the act of April 12, 1862 (*Sess. Laws, p.* 368). The act of 1862, section 5, provided, "such killing, unless it be manslaughter, or excusa-

homicide, as hereafter provided, shall be murder in the first degree in the following cases:

*First.* When perpetrated from a premeditated design to effect the death of the person killed, or of any human being.

*Second.* When perpetrated by an act emminently dangerous to others, and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual.

*Third.* When perpetrtrated in committing the crime of arson in the first degree. Such killing, unless it be murder in the first degree, or manslaughter, or excusable, or justifiable homicide, as hereinafter provided, or when perpetrated without any design to effect death, by a person engaged in the commission of any felony, shall be murder in the second degree. (*Edmond's Rev. Stat., vol. 2, p.* 677.)

The act of 1862, differs from the act of 1860, in its definition of murder in the first degree, in one essential particular. The act of 1862 using the following words: "When perpetrated from a premeditated design to effect the death of the person killed, or of any human being," instead of "wilful, deliberate, and premeditated killing," as contained in the act of 1860. "Premeditated" is one of the strongest words in our language, and it would appear, in consequence of the use of this word, as if the revisers required as an element of the capital crime, a quantum or continuance of deliberation or premeditation, greater than the simple formation of an intent to kill, formed at the instant of striking the blow, which results in death.

In the case of the *People* agt. *Weiler,* tried before Recorder HOFFMAN, at the February term of the court of general sessions, 1862, in giving a construction to the act of 1860, said in his charge to the jury:

"This indictment is for murder. The statute of this state declares, that the killing of any person with a premeditated design to effect the death of the person killed, is murder in the first degree. It specifies certain other instances in which killing is murder in the first degree, and then says, all other murder is murder in the second degree. The fair and liberal interpetration of this statute, an interpetration which the judges in this district, at any rate, seem to be determined to give it, although it may be open to criticism, is, that in order to constitute murder in the first degree, the premeditation must have existed prior to the inmediate occurrence which resulted in the death, as for instance, where one lies in wait to assassinate another, and then afterwards kills, that is a case of premeditation preceding the occurrence which results in death; or if one, prior to meeting another, forms a design to kill, either an absolute design to kill him, or a design to kill him under certain circumstances, and prepares himself for the killing, if the circumstances should arise, and then carries out his design, that would be murder in the first degree; but if upon a sudden quarrel or meeting between parties, one kills another designedly and with malice, there being no previous deliberation, the legislature, I think, intended to treat that as a case of murder in the second degree. This is as good an interpretation, and as plain a one, as I am able to give of the law."

There was a conviction of murder in the second degree, and the case was never reviewed. This honorable court is asked to place the same humane and charitable construction on the act of 1862 as was placed by that learned and eminent jurist on the act of 1860, thus making due allowance for the infirmities of our nature.

The leading cases in this state, and which have been and are now relied upon by the courts upon this point, are *People* agt. *Clark and Sullivan* (7 *N. Y. R.,* 3 *Seld. pages* 385 *and* 396). It was held that, if the intention precedes the act, although that follows instantly, it constitutes murder in the first degree. At the time of the decision, murder was not divided, as it is now, into degrees, and might now perhaps be regarded quite inapplicable. At common law, if the design to kill were formed at

Lanergan agt. The People.

the instant of striking the blow, it would be murder. It would be "malice afore-thought;" but certainly, under the Revised Statutes, it would not be a "premeditated killing." (*People* agt. *Clark*, 7 *N. Y. R. p.* 385; *State* agt. *Turner*, *Wright's R.* 20; *Clark* agt. *State*, 8 *Humph.* 671; *People* agt. *Sullivan*, 1 *Parker Cr. R. p.* 347.)

It is but due to this honorable court to state that, since the trial of this case at bar, this court has held, in the case of *People* agt. *Skeeheen*, June general term, 1867, opin-ion by LEONARD, P. J., in giving a construction to the act of 1862, that murder in the second degree was the killing while in the commission of any felony other than arson in the first degree, and the decision stands unreversed.

II. The court erred in refusing to compel the district attorney to elect upon which count in the indictment he would claim a conviction, and in not compelling the jury to specify upon which count they convicted the prisoner. There were three counts in the indictment; the second count charged the killing with an axe, the first by the use of a knife, and the third by beating and choking.

After the testimony closed, both on the part of the prosecution and the defense, and before the case went to the jury, counsel made the application to the court, on the ground that the killing was of a different nature and character in each count. The court refused to compel the district attorney to elect, allowing the whole indictment to go to the jury.

A verdict of guilty, as in the case at bar, on an indictment containing three counts, each count specifying a different kind of killing, without the prosecuting officer elect-ing upon which count in the indictment he claims a conviction, and the jury particu-larly specifying upon which count they convict the defendant upon, is repugnant, inconsistent and void, and should be set aside. The verdict, as recorded, finds the prisoner guilty on the three counts, that Lanergan killed his wife three times in one day, a physical impossibility. A beating and choking to death is quite a different death from a killing with a knife or an axe. The evidence must have shown the cause of death either by a knife or an axe, or beating and choking, in order to have supported the indictment at all. (*State* agt. *Donnely*, 2 *Dutcher N. J.* 463; *Wharton Am. Cr. Law*, 2d vol. 5th rev. ed. p. 3047, *note and authorities; Wharton Am. Cr. Law*, 1st vol. 5th rev. ed. p. 426; *State* agt. *Fox*, 1 *Dutcher N. J.* 566; *Archibold's Cr. Plead-ing*, 1st vol. 7th ed. p. 883 to 866; 2 *Hales' P. C.* 185, 186; 2 *Hawkins' P. C. ch.* 23, § 84; 1 *East's P. C. ch.* 5, § 107, p. 341; *State* agt. *Abraham*, 6 *Iowa* (*Clark*), 117.)

The case of *The People* agt. *Colt* (3 *Hill's N. Y. R.* 432), cited by the district attor-ney, is quite inapplicable, the point being different entirely.

III. The court erred in refusing to charge in the affirmative upon the following proposition of law:

"That the fact of the intoxication of the prisoner, if proved to the satisfaction of the jury, is a proper matter to be considered by the jury in determining the question as to whether his mind was in such a condition as to be able to form an intent to kill or a premeditated design to effect death."

The evidence shows that, at the time of the alleged killing, the prisoner was drunk, intoxicated to such an extent as to be quite powerless. The prisoner, to use the lan-guage of the witness Cram, in answer to a question, " I am satisfied in my own mind that he did not know anything" (that is the whole amount of it), "from his actions." The whole evidence, as developed upon the trial, tended to show that the prisoner was in a beastly state of intoxication.

Where the question of intent or premeditation is concerned, the fact of the intoxi-cation of the prisoner is material in determining whether the mind was in such con-dition as to be able to conceive an intent to kill, and thus determine the precise degree of guilt. (*Wharton Am. Cr. Law*, 1 vol. §§ 41, 44; *People* agt. *Rogers*, 18 *N Y. R. p.* 26; *People* agt. *Rogers*, 3 *Park. Cr. R. p.* 649; *Swan* agt. *The State*, 4 *Humph*

Lanergan agt. The People.

*p.* 136; *Pertle* agt. *The State,* 9 *Id.* 670; *Haule* agt. *The State,* 9 *Id.* 154; *Pennsylvania* agt. *McTall, Addis.* 957; *United States* agt. *Bendenbush,* 1 *Baldw.* 514.)

IV. The court erred in admitting the declarations of the wife in evidence while the prisoner was both drunk and asleep in the chair, although made in his presence.

The witness Cram said that the wife of the prisoner said in his presence, "Do you think he will kill me?" I said, "No; what humbug." At the time of this declaration Lanergan was drunk and asleep in the chair. What is said in the presence of another, while he is in the full possession of his senses, is admissible, for the reason that he has an opportunity to deny it, but not as in the case at bar, when he was deprived of his reason. The silence of the prisoner after the question of the wife was taken most strongly against him, and the admission of this piece of testimony greatly prejudiced his case. The prisoner occupied the same position as if he was deaf or dumb, so far as concerned the admission of that piece of testimony.

V. The court erred in refusing to entertain a motion for a new trial.

After the rendition of the verdict, and before sentence, counsel for the prisoner moved for a new trial. The recorder refused to entertain such motion; on the ground that the court of general sessions had no such power. Counsel cited the following act in support of the application, which the recorder held inapplicable to the court:

"The courts of sessions of the several counties in this state shall have the power to grant new trials upon the merits, or for irregularity, or on the ground of newly discovered evidence, in all cases tried before them." (*Session Laws of* 1859, *p.* 794, ch. 339, § 4.)

This act is broad and comprehensive enough to include under the word "sessions" the court of general sessions of the peace in and for the city and county of New York. It has been so held by the court of appeals, and the court erred in refusing to entertain the motion. (*People* agt. *Powell,* 14 *Abb.* 91; *People* agt. *Lowenburg,* 27 *N Y. R.* 326; *People* agt. *Ferris,* 35 *N. Y. R.* 124.)

The court is not asked to reverse the judgment on this ground, but to remit the record to the court of general sessions, with directions that the court hear the motion. This court, exercising appellate, and not original jurisdiction, cannot hear this motion at this time.

VI. The verdict was against the evidence.

VII. The judgment should be reversed, and a new trial awarded to the prisoner.

## A. OAKEY HALL, *for the people.*

*First.* The judge could not compel an election upon the counts. To be sure, each charged a different weapon. The inquiry was, did he kill her with any instruments? (*Settled in Colt's case,* 3 *Hill,* 432.)

The object of these various counts is to prevent a surprise upon the prisoner by evidence.

One count stated an axe, and the evidence was of an axe as the instrument of murder.

The case of Colt is certainly much stronger, for there the count was of an instrument *unknown.*

Thus one count here was consonant with evidence and good. Judgment upon any one good count is valid. (*Guenther's case,* 24 *N. Y.* 100.)

*Second.* The request appearing in first point of prisoner's counsel asked too much. It used the word "prior," to the exclusion of the questions "at the time of," or "during," &c. It also used the word "duty," instead of province. A judge has no right to tell the jury that it is their *duty* to convict in a certain degree, &c., &c., &c.

*Third.* The request embodied at point third also asked too much. It used the word

determining, instead of influencing. Besides, had the latter word been used, the jury could not consider the intoxication of an alleged·murderer, except under law of *Rogers* (88 *N. Y.* 21, 27), *Kenney* (31 *N. Y.* 344, *end of case*), and many others when before this court, like *Friery, Ferris*, &c.

*Fourth.* The court below held that what took place and was said in presence of prisoner was *admissible* and competent, leaving the jury to judge of its weight and effect.

Was it not a fact for the jury to weigh, whether or no prisoner was deaf or insensible, or able or unable to give or withhold assent? Was the judge to adjudicate that preliminary fact?

The evidence was slight or strong, according to circumstances.

If prisoner was "mazy" or "muddled," then what was done or said did not weigh much; but if he was feigning drunkenness, and heard, then those facts were strong. Besides, the judge duly cautioned the jury on the matter.

*Fifth.* A motion for a new trial is in discretion. If the court had jurisdiction, then its discretion, exercised negatively, is not reviewable in error.

But, by special statute, the appellate courts have power to grant a new trial upon merits, in criminal cases.

Even if the sessions had jurisdiction of a new trial motion, and erred in refusing to entertain it, or indiscreetly denied it, why ask to remit for argument in that court the motion which this court has just as ample power to hear and decide now?

*Sixth.* On the grounds that the evidence showed the prisoner possessed with motive to kill, and furnished with opportunity to kill, and was beyond all doubt the malicious killer, the people ask that "substantial justice," under the law of 1855, may be answered by affirming the conviction.

LEONARD, P. J. Maurice Lanergan was indicted, tried and convicted, in the court of general sessions of the city of New York, of murder in the first degree, and sentenced to be executed.

The case comes up before this court on a writ of error.

The indictment charges Lanergan on three counts with killing Delia Lanergan: first, with a knife; second, with an axe; third, by beating and choking. The·deceased was the wife of the accused. Both began to use intoxicating liquors excessively on St. Patrick's day, and continued to do so, becoming more and more subjected to intoxication, till the evening of March 26, 1867, when the death of Delia occurred by violence.

They occupied two rooms in a tenement house in Washington street, on the second floor, one of which they let for a lodging room to Tully and Cram, who were witnesses at the trial.

John Sullivan (stated in the charge of the recorder to be a

lad of thirteen years), testified that he resided in the same house. That towards evening, about two hours and a half after the school which he attended had closed for the day, or about 5½ o'clock P. M., he was going down stairs, and saw Mrs. Lanergan on the floor, near the door of the rooms which the accused, with his wife, occupied, and the accused then beating her with something he had in his hand. He could not see what the accused had in his hand. When Lanergan saw the boy, he "drew the thing back," and put his hand over the mouth of the deceased. Tully, one of the lodgers, came out of the door and went down stairs, passing the witness. Lanergan closed the door. Nothing appears to have been spoken by anyone at this time. He does not mention any noise.

Thomas Carron testified that he occupied a room adjoining that of Lanergan. A little before night, half an hour or so, on the day of the occurrence, he heard three knocks, as it might be of an axe or sledge, in Lanergan's room. In less than an hour he saw Lanergan come out of the room, go down stairs, and out of the house. When Carron left his own room, the door of Lanergan's room was closed. Nothing was said by either of them. Later in the evening he heard Tully in Lanergan's room, hallooing and clapping his hands. He thinks it was about ten o'clock. He went into the room, and saw the deceased lying upon the bed, dead. He heard no scream when he heard the knocks. After this he went at once for the sister of the deceased, Mrs. Hickey, and met Lanergan on the way to his rooms. Lanergan was then returning from Mrs. Hickey's residence, where he had been, and informed her that his wife was dead.

Tully testified that Lanergan and his wife were in bed when he left the house to go to his business, on the morning of the 26th of March. He returned between 6 and 6½ o'clock P. M., and saw Mrs. Lanergan then in bed. Lanergan told the witness he had better get his supper. He left the house, not his supper, and appears to have met Lanergan at about

8 o'clock, when the two, together with John Hickey, the brother-in-law of Lanergan, took a drink at a public house. They played dominoes at another public house, near by, till after ten o'clock. Tully then went to his room at Lanergan's house, having a night key, with which Lanergan had supplied him. He thought Lanergan under the influence of liquor when he left him. Tully went to the rooms, went in, lit a light, saw Mrs. Lanergan in bed; called, but got no answer; went over and listened to hear her breathe; laid his hand on her chest and found it cold. He then gave the alarm, and called the neighbors.

The week previous Tully saw Lanergan strike the deceased (who was under the influence of liquor, and in bed), with a broom handle upon her hip, to keep her quiet. She was striving to get up, and made a racket, and Lanergan struck her to keep her quiet.

Tully testified that he left the house at $7\frac{1}{2}$ that morning, and did not return until $6\frac{1}{2}$ P. M. Was not at the room at $5\frac{1}{2}$ P. M. Did not see Lanergan beat his wife while she was on the floor. He knows the boy Sullivan by sight. Did not pass him at the time of such an occurrence as the lad testified to.

Cram, who occupied the room with Tully as a lodger, testified that he took Lanergan home about one o'clock on the day of the occurrence, from the residence of Hickey, where they had dinner; that Lanergan was very drunk, and staggered against his wife when he went in, grabbed her, and "went to strike her;" but Cram calling to him not to strike her, for God's sake, and the deceased repeating the words, he staggered into the rocking chair. From his actions, Cram was satisfied that Lanergan was so drunk that he did not know anything. Cram then advised her to lie down. She inquired of Cram if he thought Lanergan would kill her. He replied, "No; what humbug!" Cram says that Lanergan was then asleep in the rocking chair.

The prisoner's counsel objected to this evidence. The court overruled the objection, and an exception was taken.

The witness then further testified: "I told her it was "humbug, or something to that effect; Mrs. Lanergan asked "me not to go out, but to put him to bed; I went and asked "him, said I, Maurice, get into bed; I then assisted him to "get into the bed; I then left the house."

Lanergan took his dinner that day at Hickey's, and was then quite intoxicated. Referring to the drunken condition of his wife, he said with an oath, while at Hickey's, that he would kill her. Hickey did not think that he meant any harm by this threat. Mrs. Hickey said, "Lanergan, you know you have a good wife." Lanergan cried, and praised the goodness of the deceased.

On an examination of the room occupied by Lanergan, made the next morning, an axe was found there with blood.

The post-mortem examination showed a contusion upon the side of the head, made with some blunt instrument. The dura-mater, or membraneous covering of the brain, was ruptured, immediately under the contusion, but the skull was not fractured. There was also a broken broom handle in the room. A knife was taken from the pocket of the prisoner at the station house, and the policeman who made the arrest, and was examined as a witness, testified that he thought the blade appeared to have been recently rubbed.

It should be further observed that the post-mortem examination disclosed only a local extravasation of blood at the place where the skull and dura-mater were bruised; but there was nothing otherwise in a healthy condition.

The face, arms and legs of the deceased appeared to be black and blue, and exhibited signs of bruising.

The witness also speaks of her face as swollen and discolored before the fatal occurrence took place. It is also proven that she had fallen down a flight of stairs. Several witnesses testified to the general good character of Lanergan, as a quiet,

peaceable and inoffensive person, not quarrelsome, but very peaceable in his disposition.

After the evidence was closed, the prisoner's counsel requested the recorder to charge the jury:

"That in order to constitute murder in the first degree, "the premeditation must have existed prior to the immediate "occurrence which resulted in death;" also, "that if, upon a "sudden quarrel or meeting between both parties, one kills "another designedly and with malice, there being no previ- "ous deliberation, it is the duty of the jury to treat such as "a case of murder in the second degree."

Also, "that the fact of the intoxication of the prisoner, if "proved to the satisfaction of the jury, is a proper matter to "be considered by the jury in determining the question as to "whether his mind was in such a condition as to be able "to form an intent to kill, or a premeditated design to effect "death."

There were other requests made to charge as to the law, but no question has been raised here in respect to any other.

The recorder refused to compel the district attorney to elect upon which of the three counts in the indictment he would claim a conviction, and to this refusal there was an exception.

The prisoner's counsel moved for a new trial, on the ground that the verdict was against the law and the evidence. Argument was then had by the prisoner's counsel and the district attorney, as to the power of the court to entertain the motion. The recorder said, that, assuming that he had the power to hear the motion (but not passing upon that question), no argument would induce him to grant a new trial, either upon errors of law or of fact, and thereupon denied the motion.

Upon being further requested to decide whether the prisoner had the right to move for a new trial in that court; upon the merits, the recorder further said, "I decide this court has not that power." The counsel for the prisoner then said,

"We except to your honor's refusal to entertain the motion for a new trial."

The prisoner's counsel also insists before this court, upon the present appeal, that the verdict is against the evidence. The recorder did not, in his charge, declare the law in conformity with the requests above stated, made by the counsel for the prisoner.

Previously to the act of 1860, the law was well settled that an intent to kill, formed on the instant of the killing, was proof of premeditation, and established the malicious intent necessary to constitute the crime of murder.

The use of numerous adjectives in the act of 1860, defining murder in the first degree as "willful; deliberate and premeditated" killing, and the enactment of a second degree of murder not punishable by death, induced the judges of the first district, or some of them at least, to hold that an intent to kill, formed at the instant of killing, was not such premeditation as the new statute contemplated. This construction was further confirmed by the immediate conjunction of the adjectives cited above, with a reference to specific acts of murder in the first degree, by poison and lying in wait, involving a premeditation of some considerable time, and embodying the idea of a preconceived plan. Certain other acts of killing, while in the commission of specific crimes, were also declared to be murder in the first degree, without any reference to malice or premeditation. It is not necessary now to decide whether the construction given to the act of 1860 was correct or not. The act of 1862, while retaining the division of two degrees in the crime of murder, has provided three very distinct definitions of murder in the first degree. The first declares that the killing of a human being with a premeditated design to effect death shall be murder in the first degree. This definition is the same as the first definition of the crime in the statutes prior to 1860. The application of the term "*premeditated*" to an intent formed on the instant of the killing, so well established by the courts as

Lanergan agt. The People.

proof of a malicious intent to commit murder, must be deemed to have been understood by the legislature, and that it was intended that there should be no change in the meaning or application of that term, as applied to the killing of a human being.

Premeditation proves a malicious intention when applied to a homicide; and when the killing occurs with an intent to effect death, however instantaneously the intent is formed prior to the commission of the deed, the crime is murder. Under the law, as it existed prior to 1860, the penalty of that crime was death. Since the act of 1862, such killing is murder in the first degree, and the penalty is the same. The word "premeditated" is used in the same connection in the old and in the present statute, and must have the same meaning and construction.

The definition of murder in the second degree is exceedingly obscure, under the act of 1862. A slight verbal alteration will make it definite and certain, and not unreasonable, or perhaps it is better to say, not without reason. As it reads literally, there is no affirmative definition of murder in the second degree. The second degree is such murder as is not within the definition of murder in the first degree.

The last sentence of section 5, defining the crime of murder, as contained in the act of 1862, reads as follows: "Such "killing, unless it be murder in the first degree, or man- "slaughter, or excusable or justifiable homicide, as herein- "after provided, or when perpetrated without any design to "effect death, by a person engaged in the commission of any "felony, shall be murder in the second degree."

The inquiry occurs; why, except from the definition of murder in the second degree, the killing of a human being by a person engaged in the commission of a felony, although perpetrated without any design to effect death? Such killing was formerly murder, and the penalty death, when no division of the crime of murder into first and second degrees existed. Under the statute, as it existed prior to 1860, such

killing was embraced in the third definition of murder in express language. The first and second definitions of murder in the first degree, as contained in the act of 1862, are the same, *verbatim*, as contained in the definition of murder by the statute, before the division of that crime into two degrees. The third definition of murder in the first degree, by the act of 1862, includes killing only when perpetrated in committing arson in the first degree. The third definition of murder by the statute in force prior to 1860 was in these words: "When perpetrated without any design to effect "death, by a person engaged in the commission of any "felony." The third definition of murder is the only part of the former law that has been modified. In other respects, the three definitions of murder in the *first degree* are the same now as those of *murder*, contained in the statute before 1860. A further reference to the statutes is in vain to find what crime is committed by the killing of a human being, " when "perpetrated without any design to effect death, by a person "engaged in the commission of any felony." As the statute now reads, such killing is not murder in the first degree, and it is excepted from the definition of murder in the second degree, nor is it found in any other portion of the statutes punishable as a crime. Clearly, it could not have been the intention of the legislature to exempt such a class of crime from any punishment. I will not undertake to declare in this case that the statute, as now existing, can be amended by any judicial construction. It is not necessary so to do. I will barely suggest that an obliteration of the last "or," occurring in the sentence of section 5 in the act of 1862, defining murder in the second degree, will remove the obscurity now existing, and give an express affirmative definition to murder in the second degree, in harmony with the modification of the third definition of murder, as contained in the statutes prior to 1860, into murder in the second degree, except in the single instance of killing when perpetrated in committing arson in the first degree. It will, per-

haps, not be too much to say that, in my opinion, such an amendment by judicial construction will be in harmony with the intention of the legislature.   It will, I think, be impossible to conceive of any definition of murder, as embraced in the law prior to 1860, not now defined to be murder in the first degree, except killing without premeditation or design, by a person in the commission of a felony other than arson in the first degree.   The conclusion is entirely satisfactory to my mind, that it was intended to embrace killing, under the circumstances last mentioned, within the definition of murder in the second degree by the act of 1862.   Unless this class of homicide be included, there is no crime embraced in the present definition of murder in the second degree.

I expressed the same opinion substantially in the case of *The People* agt. *Skeehan*, recently decided by the general term in this district, without any elaboration or course of reasoning by which I had reached that conclusion.   A reference to that opinion by the counsel for the prisoner has induced me to make this explanation.   My reasons have now been given, as they ought to have been in the former case, that the conclusion there stated may stand only for so much as it shall prove to be judicially worth.   No doubt it would be better that the amendment should be made by the legislature, rather than left to the construction of the judiciary.

It is evident, from the previous observations, that the recorder committed no error in declining to charge in conformity with the first two requests of the prisoner's counsel, relating to premeditation and deliberation, as applicable to murder in the first and second degrees.  Both requests assume that an intent to kill, formed at the time of the commission of the act, will not be evidence of premeditation.   The rule of law is otherwise, and the requests are not consistent with the rule.

The remaining request is in reference to the mental condition of the prisoner, arising from an intoxication, which the recorder was requested to instruct the jury they might

take into consideration, in determining whether he was able to form an intent to kill, or a premeditated design to effect death.

The evidence established that the prisoner had been drinking intoxicating liquors for some days, and that he was very much intoxicated at one o'clock, some four or five hours before the probable time when the killing occurred. Carson, one of the witnesses, saw him go out of the house, leaving his wife there dead, from violence which he had inflicted, and he required no assistance to walk; neither doing anything to call for a remark, so far as it appears from the evidence, nor making any observation, but knowing sufficient to conceal his crime for several hours, and until her death was discovered and the alarm given, at or about ten o'clock in the evening. After passing the evening at different public houses, from the time he left his own rooms after the murder (between six and seven o'clock), until ten o'clock, when he went to the residence of the sister of his deceased wife, and informed her that his wife was dead. He then returned to his own rooms, and neither did or said anything tending to show any want of his usual intelligence or understanding, so far as appears from the evidence. There are few instances of persons who have, in a state of intoxication, taken the life of another, who could refrain from saying or doing something which would tend to inculpation, for nearly four hours after the commission of the act.

There is no evidence tending to establish the existence of any mental disorder or aberation at the time of the offense committed. There was no evidence to show that the will of the prisoner was not entirely the regulator of his conduct.

The rule appears to be that drunkenness is no excuse for crime, and that the person who is voluntarily in that condition must take the consequences of his own acts. (*People* agt. *Rogers*, 18 *N. Y.* 9.)

It appears, too, from the same case, that intoxication may be adverted to where "you would not infer a malicious

intent," or where the accused has been aggravated by the conduct of the deceased, but not where the killing was caused by the use of a dangerous instrument.

The evidence of intoxication is admissible in every trial for murder, because it may tend to cast light upon the acts, observations or circumstances attending the killing.

Intoxication must result in a fixed mental disease of some continuance or duration, before it will have the effect to relieve from responsibility for crime.

There was no error in refusing to charge as requested upon the subject of intoxication; nor was there any error in refusing to require the public prosecution to elect between the three counts in the indictment. The prisoner was apprised of the charge, and that proof would be produced to show that the crime was committed in one of the several ways in which it was charged.

The conviction is for murder in the first degree, the crime charged in each count, and not of the facts which constituted the offense.

In Colt's case, the indictment charged the killing with an instrument unknown, in one count. and in another with a hatchet. The indictment was sustained upon appeal, and also the admission of evidence tending to show that the killing was committed by a ball from a pistol, a weapon not mentioned in the indictment, and the evidence was admissible only under the general count, of killing with an unknown instrument.

In the present case, there was evidence tending to prove that the offense was committed with an axe.

The prisoner also had a pocket knife, which the policeman thought had been recently rubbed, leaving a possible inference that an attempt had been made to remove the stain of blood.

The evidence, or rather the probability, of the commission of the offense with the knife, was very slight.

From the evidence of the boy Sullivan, there was more

probability that the offense was committed by beating or choking.

I can perceive no inconsistency in the conviction had under these counts, and no injury to the defense, or the fairness of the trial.

The recorder denied the motion for a new trial upon the merits. He declared that he would not grant a new trial for any error of law or fact appearing in the case, assuming that he had the power to hear the motion. He was afterwards invited to declare whether he had the power to entertain the motion, and he gave his opinion that he had not the power.

I think, upon the authority of *Lowenburg's* case, in the court of appeals, that the recorder was mistaken in his opinion; but if he had granted a new trial, his mistake would have been much greater, it would have been an error.

There was no error in admitting the evidence of the conversation between the witness Cram and the deceased. Lanergan was present, and, although very drunk, it appears that he was not wholly insensible, although Cram says he was satisfied that Lanergan was so drunk he did not know anything; for it appears that he immediately afterwards asked Lanergan to get into bed, and he complied, with the assistance of Cram.

The conversation was wholly immaterial, as affecting the result. It showed that Cram did not believe Lanergan would kill her, while she had so much apprehension as to ask the opinion of Cram about it.

The evidence tends to prove an absence of malice, rather than the contrary.

There was also some reason to doubt the exact truth of the evidence that the prisoner was so drunk, was " so drunk that he did not know anything," and that "he was asleep;" and in that aspect it was admissible, and competent for the jury to pass upon its weight or sufficiency as evidence.

Upon the merits, the judgment is, in my opinion, correct. I am unable to perceive that there is any error of

law or fact, or that any injustice had been done by the con-
viction.

There appears to be no evidence showing any motive to
induce the commission of the crime.

. The evidence of the lad Sullivan proved that Lanergan
attempted to conceal the act which he was committing, and
suppress any attempt his wife might make with her voice to
give an alarm.

It is true that the evidence of the lad was contradicted by
Tully, but both were before the jury, and it was their
province to decide upon the credibility of the two witnesses.

The prisoner also concealed the killing for several hours.
He has never admitted the killing by himself, and claimed
that it was an accident, or for any cause excusable, at least
there is no evidence of any such admission.

Concealment is well settled, in evidence of malice, of a
premeditated design to commit the deed.

If he had not intentionally committed the killing, some
human emotion would have induced him to betray his sorrow
or his consciousness of his own overwhelming disaster.

The evidence of the sounds heard in the room of Lanergan
by Carron; the axe found there with marks of blood on it;
the contusion upon the head of the deceased with a blunt
instrument; the fact that the deceased and the accused were
left together in their rooms at one o'clock by Cram, when
she was last seen alive; that he was seen to leave the rooms
shortly after the heavy sounds or knocks heard by Carron;
that Tully found the door locked when he returned, at about
ten o'clock, no one appearing to have been there after Carron
saw Lanergan leaving the place; that after passing the even-
ing away from his room, from the time he left there when
Carron saw him till about ten o'clock, when, without anyone
giving him the information, he was able to go to the resi-
dence of Hickey and inform Mrs. Hickey that his wife was
dead, he having previously omitted to make any mention of
the fact to Tully or to his brother-in-law, Hickey, with

whom he had passed a considerable portion of the evening; all these facts, aside from the evidence of the lad Sullivan, make a strong case of premeditated murder. Tully saw Mrs. Lanergan in bed, as he thought, at 6 or 6½ o'clock P. M., and Lanergan advised him to get his supper elsewhere. It is probable, from the evidence of Sullivan and Carron, as to the time when the former saw Lanergan striking his wife, and the latter heard knocks as with an axe or sledge, that the murder had been then committed. Tully was mistaken in supposing that she was alive and lying down in her dress. If so, then the skill with which Lanergan induced Tully to go away was sufficient to rebut any idea of stupefaction from intoxication, and to establish premeditation or design in the commission of the killing.

In my opinion the judgment should be affirmed.

SUTHERLAND, J.   I concur in the conclusion, but I would suggest that the *presiding* judge is certainly mistaken in his construction of the fifth section of the act of April 12th, 1862.   The last " or " in that section should be read " and."

Compare that section with section 4th.

The killing, without premeditated design, in the commission of a felony, is not excepted in the last sentence of the 5th section, but is made murder in the second degree by it.

The whole act, and especially section 5th, is crudely drawn, but I think its meaning is quite plain.