THE PEOPLE, RESPONDENT, *v.* PATRICK CALLA-
GHAN (Impleaded with another), APPELLANT.

CRIMINAL LAW—MURDER—PROVINCE OF JURY.—It is the province of
the jury to determine the degree of the offense, and when the
commission of the homicide is admitted it is not error for the
court to refuse to instruct the jury that the facts do not bring
the case within any of the higher degrees of homicide, unless
the testimony tending to reduce the offense be clear, positive
and uncontradicted.

ID.—EVIDENCE—BURDEN OF PROOF.—If a homicide be admitted or
proved beyond a reasonable doubt, and if, in making such proof
on the part of the prosecution, no circumstances in mitigation,
or that excuse, or justify it, have been shown, then the law in-
fers that the homicide was murder, and, if the defense be that
the killing was not malicious, but was the result of sudden pas-
sion, or in necessary self-defense, then such matters of defence,
to be available, must be sustained by a preponderance of evi-
dence.

ID.—MALICE.—The word "Malice" is defined by § 1836 of the Com-
piled Laws, 1876, to "import a wish to vex, annoy, or injure an-
other person," and is used in this sense in § 1917, defining
murder to be "the unlawful killing of a human being with malice
aforethought."

ID.—PREMEDITATED.—Premeditated means thought of beforehand,
for any length of time, however short; it is not inconsistent with
premeditation that no appreciable space of time should lapse
between the intent to kill and the act of killing.

ID.—INSTRUCTION—SELF-DEFENSE.—A certain instruction, quoted in
the opinion, as to the law of self-defense, held to correctly state
the law.

ID.—EVIDENCE—RES GESTÆ.—On the trial of an indictment for mur-
der, the *res gestæ* will include statements by one of the partici-
pants in the fatal affray a few moments after its occurrence,
and explanatory of it, but will not include statements made
three miles from the scene of the conflict, and after the lapse of
sufficient time for reflection.

ID.—EVIDENCE—DYING DECLARATION.—The deceased, while under
the present apprehension of impending death, and in answer to
leading questions, stated the circumstances attending the affray
in which he was shot. Both questions and answers were reduced
to writing at the time, but were not signed by the deceased;
*held* that the writing so made was properly admitted in evi-
dence.

ID.—WITNESS.—When in a criminal case the defendant testifies in
his own behalf, it is proper for the court to call the attention of
the jury to the interest of the witness in the result of the case,
provided his credibility as a witness, and the weight of his evi-
dence, be left to the exclusive judgment of the jury.

ID.—PLEADING AND PRACTICE—EVIDENCE.—The indictment charged
that three defendants held a pistol, and that with the pistol so
held killed deceased; evidence proving that one of the three held
the pistol and fired the shot, and that the others aided and
abetted therein, *held* to sufficiently support such charge.

ID.—AFFIDAVITS FOR NEW TRIAL.—Affidavits used on a motion for a
new trial will not be considered by the appellate court unless
brought into the record by a statement or bill of exceptions.

ID.—SEPARATION OF JURY.—It is in the discretion of the court to
permit the jury to separate during the trial on an indictment.

ID.—IMPANELING THE JURY.—In impaneling a jury in a criminal
case, the clerk must first draw from the general box twelve
names, and both the prosecution and the defense be required to
exhaust all of their challenges as to the proposed jurors so
drawn, and those unchallenged be sworn to try the case; then a
sufficient number of names should be drawn from the box to
complete the twelve, and the same process be repeated as to such
supplemental drawing, until a jury be obtained.

APPEAL from a judgment of the district court of the
second judicial district, and from an order refusing a new
trial.

In impaneling the jury, the names of twelve jurors
were drawn from the general box, of whom one was chal-
lenged for cause by the defendant, the challenge sustained
by the court, and the juror excused. The defendant then
demanded that, before he should be required to proceed
with other challenges, either peremptory or for cause, that
the vacancy so caused should be filled by drawing another
juror; but the court ruled that, before the number of
twelve should be replaced from the general box, that both
prosecution and defense should exhaust all of their chal-
lenges, both for cause and peremptory, as to the twelve
jurors first drawn. The remainder unchallenged should
be sworn to try the case, and then the panel should be
filled by supplemental drawings.

To this ruling the defendant excepted.

The other facts are sufficiently stated in the opinion.

*Mr. Arthur Brown* (*Mr. John W. Christian* was with
him on the brief), for appellant.

Sec. 268 of the Criminal Practice Act is only declara-
tory of the law as it existed prior to the statute: *Webster's*

*Case,* 5 Cush.; Wharton on Crimes, §§ 707-712; Wharton's Cr. Ev., § 334 and note; and only applies to cases of secret killing—it has no application where the circumstances attending the killing are known, and show some provocation, no matter how slight: 60 Cal. 4; 59 Cal. 607; 49 Cal, 611; *People* v. *Tracy,* 1 Utah 343; *People* v. *Stokes,* 53 N. Y. 177; *Com.* v. *Hawkins,* 3 Gray 465; 7 Gray 583.

The court improperly defined "premeditation:" 35 Mich. 18; 76 Mo. 361; 14 Neb. 568; 91 N. Y. 212.

The court improperly defined the word "malice:" *State* v. *Hardie,* 47 Ia.; 2 Am. Cr. L. R. 326; *People* v. *Maher,* 10 Mich.; 35 Mich. 18; 36 Cal. 255.

The court erred in its charge to the jury on the law of self-defense.

The doctrine of necessity was added to the statute. That has long since been repealed by the common law and by our statutes. The court applied it in this language— that the defendant could only be justified in "using no more force than necessary"—nothing in the statute justifies that modification. It often happens that a man has the right to defend himself; when not necessary to use any force, he might run away. This was error. See Comp. Laws 587; 58 Cal. 250; *Runyon* v. *State,* 57 Ind.; *Erwin* v. *State,* 26 Ohio; 2 Am. Cr. Law 218; 1 Am. Cr. Law 251; 27 Cal. 69.

Mahoney's statement was no part of the *res gestæ:* 17 Nev. 376.

A new trial should be granted on account of the separation of the jury: *People* v. *Shafer,* 1 Utah 260.

*Mr. Zera Snow,* for respondent.

EMERSON, J.:

The appellant, Callaghan, was jointly indicted with Fennell and Fitzgerald, charged with murder in the first degree, in the killing of one Daniel Mahoney, at Frisco, in Beaver county. All three pleaded not guilty, and upon the case being called for trial, the defendant Fennel elected to be tried separately, and the trial proceeded as to the other two.

When the prosecution rested their case, at the close of their evidence in chief, the counsel for the defendant Fitzgerald moved for his discharge, on the ground "that there was no evidence implicating him with any criminal act in the case." After argument the motion was granted, and Fitzgerald, the discharged defendant, was the first witness sworn on the part of the defense.

Callaghan was convicted of murder in the second degree, and was sentenced to imprisonment in the penitentiary for a period of fourteen years, and appeals from the judgment and from an order denying his motion for a new trial.

The record presents several exceptions taken to the rulings of the court, during the progress of the trial, together with a great number of exceptions relating to the instructions given and refused, which will be noticed in the order in which they were presented to this court.

The first point urged upon our attention by the appellant is, that the court erred in refusing to instruct the jury that it was a case of manslaughter only.

It is the province of the jury, under proper instructions from the court, to determine the degree of the homicide, and the court should not usurp this function. The court should, as it did in this case, inform the jury what circumstances will, in law, reduce a homicide from murder to manslaughter, or render it excusable or justifiable, and leave them to apply the law to the facts in proof. A case might be imagined, where the testimony was so clear, positive and uncontradicted, that the court would be authorized to instruct the jury, that the uncontested facts did not bring the case within any of the higher degrees of homicide, but whether the defendant is guilty of some lower offense, or not guilty at all, must still be left to the jury upon the facts as they shall find them. This, certainly, is not a case like the one last above referred to.

It appears from the record of the testimony sent up, that the deceased was a constable and night watchman; that the shooting, resulting in his death, occurred at about three o'clock on Sunday morning, August 3, 1883, while he was on duty as such night watchman. The place where this unfortunate affair occurred is what is known on this,

coast as a mining camp. It appears that there had been some considerable disturbance in different portions of the town, during the early part of the evening, and preceding the shooting. It also appears, from the testimony, that the appellant and the other two defendants came down from the Carbonate mine early in the evening of Saturday; that they were together visiting saloons and other places and drinking quite freely. The deceased, while in the discharge of his duty, had met them several times, and had accosted them, at one time asking them if they knew who had fired certain "shots," of which they disclaimed having any knowledge. There was testimony on the part of the prosecution tending to show that subsequently to this time, the three were together and were watching for some one, and that the deceased was the one for whom they were watching. Other witnesses testified that they heard the shooting at the time the deceased was killed, and saw the defendants running from the scene, and heard the appellant say at this time "I got him at last."

With the above testimony in the case for the jury to weigh and determine, it was not error for the court to refuse the instruction asked. In connection with this request to charge, the appellant claims, that, at the time of the shooting, the deceased assulted him and fired the first shot. There is some conflict in the testimony as to what occurred just at that time. The shooting occurred immediately after the deceased had ordered the appellant and his companions to "get off from the streets and go home." One of the witnesses for the prosecution testified that she was awakened by the talking on the street, and that she recognized the appellant, by his voice, as one of those who had disturbed her: and saw two others with him, whom she did not know; that she saw the deceased come up and heard him tell the parties to "go on, go home," and after some other conversation, he said to them, "you must move on, I tell you, there is people here who want to sleep, you must find some other place to do your talking," and that the appellant turned around and the shooting commenced, and, the witness continued, "all three shots seemed to be fired at me; the first shot

seemed to come from where Callaghan stood. Dan, (the deceased) stood between me and the other three and about two feet from Callaghan; the second and third shots were nearer together than the first and second, but all in a few seconds." There is other testimony in the case, some of it direct and positive, that the appellant fired the first shot.

The deceased, as a peace officer, was in the legitimate discharge of his duty, in ordering these parties off from the streets, as they were using it not for the mere purpose of passage as a highway, but as a place of resort, to the annoyance of peaceful citizens, and at a time, and under circumstances when no legitimate business called them there. Certainly the language used by the deceased, even if it had been accompanied by a threat to arrest them, unless they obeyed his order to "get off from the streets and go home," cannot be tortured into such an assault as would authorize the court to give the instruction asked. The court gave full and proper instruction as to the degrees into which the statutes have divided the subject of homicide.

The next assignment of error is based upon the following portion of the charge: "It is admitted by the counsel for the defendant, Callaghan, on trial, and in his presence and hearing, and without objection on his part, that the defendant, Patrick Callaghan, did, on the fifth day of August, 1883, at the county of Beaver, in the Territory of Utah, kill the defendant, Daniel Mahoney, but they claim such killing was in self-defense, and therefore justifiable or excusable.

"If the killing of Mahoney by the defendant, Callaghan is admitted or proven, the burden of proving circumstances of mitigation, or that justify or excuse it, devolves upon him, unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter, or that the defendant, Callaghan, was justifiable or excusable, in the act of killing. Up to the moment when the killing is proved, or admitted, the prosecution must make out its case beyond any reasonable doubt. When the killing is admitted or proved, it devolves upon

the defendant, Callaghan, to show to your satisfaction any circumstances of mitigation, to excuse or justify, by a preponderance of evidence on his part; that is, the killing being admitted or proved, unless the evidence of the prosecution tends to show that the killing was manslaughter or was justifiable or excusable, the defendant, Callaghan, must show that it was done in self-defense, by some proof stronger in some appreciable degree, no matter how small, than the proof of the prosecution tending to show that it was not in self-defense or justifiable or excusable, or, in other words, the claim that it was done in self-defense must be sustained by a preponderance of evidence."

This was followed by a full and explicit statement of what circumstances would, in law, mitigate the act of killing.

It is claimed that the portion of the charge above quoted, was error, because it charged that the burden of proving that the act was done in self-defense was upon the defendant.

Section 268 of the Criminal Practice Act provides: "Upon a trial for murder, the commission of the homicide being proved, the burden of proving circumstances of mitigation, or that justify or excuse it, devolves upon him, unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter, or that the defendant was justifiable or excusable."

The charge, as given, although perhaps a little prolix, was in accordance with, and in explanation of the section above quoted.

I think the meaning of the statute is, and the substance of the charge to be, that if the homicide is proved beyond a reasonable doubt, and if in making this proof the prosecution have not shown circumstances in mitigation, or that excuse, or justify it, then the legal inference is that the homicide was murder, but if the defense be, as an independent exculpatory fact, that the killing was not done in malice, but was the result of sudden passion, or in necessary self-defense, in order to make these special pleas available as a matter of defense, they must be sustained by affirmative proof, proofs so preponderating over

the proofs of the prosecution, in denial of these independent exculpatory facts, as to create in the minds of the jury a reasonable doubt of the guilt of the defendant.

Our statute is but declaratory of the principle laid down in Foster's Crown Law; "in every charge of murder, the fact of the killing being first proved, all the circumstances of accident, necessity or infirmity, are to be satisfactorily proved by the prisoner, unless they arise out of the evidence produced against him; for the law presumeth the fact to have been formed in malice, until the contrary appeareth, and very right it is that the law should so presume."

The rule of the common law, declared by, and made a rule under our statute, that the *corpus delicti* must be proved beyond a reasonable doubt, was intended as a shield to prisoners, and ought not to receive such a construction and interpretation as to become a sword.

The burden of what should be proved, beyond a reasonable doubt, never shifts to the defendant, but the prosecution having proven beyond a reasonable doubt the fact of the killing, unless the circumstances of mitigation, or that justify or excuse it, arise out of the evidence against him, the prisoner must take upon himself the burden of satisfying the jury, by a preponderance of evidence, that such circumstances existed at the time of the killing, to the extent of raising in their minds a reasonable doubt as to his guilt.

There was no testimony in the case offered by the prosecution, which tended to reduce the crime to manslaughter, much less to justify or excuse it.

There was no error in refusing to give defendant's requests, numbered forty-one, forty-two and forty-three, as the substance of them, so far as applicable to the case on trial, had already been given in the charge.

The next objection urged by the appellant is, that the court erred in its charge in giving a definition of the word "premeditated," which was in the following language: "Premeditated means thought of beforehand, for any length of time, however short. There may be no appreciable

space of time between the intent to kill, and the act of killing, they may be as instantaneous as the successive thoughts of the mind." This objection is aimed at the closing portion of the above quotation. This language has been repeatedly sanctioned by the supreme court of California, and I cannot perceive any objection to its use. In this case, the appellant was acquitted of murder in the first degree, and, as applied to murder in the second degree, the offense of which he was convicted, the instruction was correct.

The court charged that a premeditated intent to kill was a necessary ingredient of murder in the second degree. In this, the charge was more favorable to the appellant than the law warrants, and, if the court erred in defining premeditation, it erred on the side of mercy, and the appellant cannot complain.

The next objection urged is, that the court erred in its definition of the word "malice." In the charge, the court gave the statutory definition of the word; the definition which the legislature has declared shall be attached to it whenever used in the code, unless a different sense plainly appears.

The court very properly undertook to, and did give the law in relation to all the grades of homicide. Our statute defines manslaughter to be "the unlawful killing of a human being without malice."

The legislature must be presumed to have used the word "malice" in the sense in which they had before declared should be given to it.

It does not vary or change the technical term "malice aforethought," as used in defining murder.

The next point urged by the appellant is, that the court erred in its charge upon the law of self-defense, and in not giving his requests upon that subject.

That portion of the charge objected to is as follows: "As to what force or circumstances are sufficient to justify or mitigate the act, I instruct you that, if the deceased, Mahoney, at the time he was shot and killed, was attacking the defendant, and if the attack was of such a character as to imperil the life, or do some great bodily

harm, so imminent and pressing that a man of ordinary prudence, in the same or like circumstances, would believe that it was necessary to take the life of his assailant to save his own or prevent his receiving great bodily harm, and the defendant, Callaghan, so menaced, acting in good faith, using no more force than was necessary to save his own life, or to prevent great bodily harm to himself, then, in such case, although it may afterwards appear that such danger was only apparent, and not real, or absolute, the defendant, Callaghan, was justified in killing Mahoney, and the act is excusable; and, in determining the question, you may take into consideration the time of the day or night it was done, and the degree of darkness or light existing at the time, and who fired the first shot."

This is a correct statement of the law on this subject, and was all that was necessary in view of the facts in proof before the jury.

There were no such complications of these as needed a more minute or detailed statement of the law to be applied to them. There was no error in refusing the numerous requests upon this branch of the case asked by the appellant. Their substance is embodied in the above and other portions of the charge.

The next question to be determined relates to the admissibility as evidence of the declarations of Mahoney, made recently after the shooting occurred.

The witnesses say they arrived on the spot five or six seconds after the shooting, and that the deceased then said: "Patsey Callaghan shot me." The prosecution insists, and the appellant denies, that this declaration so made is admissible as part of the *res gestæ.* I have no doubt that the testimony was properly admitted to be weighed by the jury. The period of time at which it was made was so recent after the shooting as to justify its admission as a part of the *res gestæ.*

No time had elapsed for the fabrication of a story. "In the admission of testimony of this character, much must be left to the exercise of the sound discretion of the presiding judge:" *Com.* v. *McPike,* 37 Mass. 181.

The statements made by the appellant, relative to the affair after arriving at the Carbonate mine, three or four miles distant from the scene of the conflict, were properly excluded, as they were no part of the *res gestæ*, but merely a narrative of a past occurrence and hearsay. There was plenty of time while appellant was traveling on foot, that three or four miles, for reflection, and in connection with his co-defendants for the fabrication of a story, which, if believed, would be a subversion of all the actual facts in the case.

It would be a very dangerous precedent indeed, to allow testimony of this kind to be admitted.

The next question relates to the admissibility in evidence of the dying declaration of the deceased. The declarations were written, but were not signed by the deceased, and were as follows: "Daniel Mahoney, being duly sworn, deposes and says, that Pat Callaghan shot me in front of Staples' place. How many shots were fired? He fired two shots. I fired one. What is your business? Night-watchman. Who fired the first shot? Callaghan. Did you hit Callaghan over the head with pistol or hand? No; I did not hit him at all. The above deposition was read to Dan Mahoney in presence of R. S. Lipscomb, W. Haynes, and P. Lochrie, this fifth day of August, A. D. 1883.

"Witness our hands:            P. LOCHRIE,
                                    "WILLIAM HAYNES,
                                    "R. S. LIPSCOMB."

Counsel for the appellant contends that it was error to admit this in evidence because

"First. As the declaration did not profess to throw any light on the circumstances of the killing, and, therefore, should not have been received."

"Second. It did not pretend to be a statement of the deceased himself, but merely his replies to a few prepared questions."

"Third. It was a written statement of others, not signed by the deceased, and the real words that were given by deceased were not introduced or offered."

"Fourth. It did not appear that the deceased thought he was about to die, but, on the contrary, the expression used by him tended to prove that he thought he would live."

The utter fallacy of all these objections will be at once apparent upon reference to the state of the testimony at the time this writing was received in evidence. The witness Haynes testified: "I heard him say he could not live. I never heard him say he had any hope of living. I said to him, 'Cheer up, while there is life there is hope.' He said that he could not live; never made any other or different answer, to my knowledge. Malloy said something to him, and he replied, 'I can't live.' . . . He sent for a priest —Scanlan. He came, and we left the room. We were requested to leave the room by the priest. They were alone together twenty or twenty-five minutes. He died about three and a-half hours after the priest was there. After the priest was there, he made a dying declaration. It was in writing. It was signed by myself, Judge Lipscomb and Lawyer Lochrie. When he made the declaration, the questions were asked him by Mr. Lochrie, and Mr. Lipscomb wrote down the questions and answers. Mahoney made no statement of his own accord; simply answered to the questions that were propounded. Before making the declaration, he was asked if he had any hope of living. He replied, 'No.' The writing was not signed by the deceased." The prosecution then asked the following question: "State what the dying declaration was?" to which counsel for appellant objected, because it appeared to be in writing, and there was better evidence. Thereupon the prosecution withdrew the question.

Lochrie was then called, and testified in substance as follows: "I witnessed the dying declaration, and asked some of the questions. It was written down correctly. I thought, at the time, he was dying. He had difficulty in breathing. The reason we did not ask him further was on account of his feebleness of health. He could hardly answer what we asked him. I thought him perfectly sane, but he was suffering extremely—his mind was clear. He —Mahoney—was conscious. He was a right-handed man.

His right hand was wounded.    I did not examine his wounds.    At the time of the declaration, his right hand and arm were bandaged; he could not, for that reason, sign the paper.    He knew he was making a dying declaration, to be used as evidence.    Lipscomb had asked him if he wanted to make a dying declaration for that purpose, and he said, 'Yes.'    He was sworn to state the truth before he made it.    He knew he could not live.    He said so—said he knew he was going to die.    On that account, he had before this sent for a Catholic priest—Father Scanlan—who was closeted with him for some time.    This paper (referring to the dying declaration) contains all that was said to him, or by him, to us, as to the shooting. It was read over to Mahoney before being signed by the witnesses.    He was so feeble he could not sign his name to the paper."

R. S. Lipscomb was then called, and testified, in substance, the same as Lochrie.    The writing, called the dying declaration, was then received in evidence, over the objection of the appellant.

The writing was properly admitted in evidence.    There can be no question but that the declarations were made under the present apprehension of impending death, and were within the rule that, to render such declarations admissible, they must be made *in articulo mortis.*

In the enfeebled state in which the deceased then was, and the difficulty in obtaining answers, there was no ground for excluding the declarations, because they were answers to leading questions.

They referred exclusively to circumstances immediately attending the shooting, and were not expressions of mere matters of opinion, but of facts that would have been receivable in evidence had death not occurred, and the appellant been on trial for an assault with intent to kill, and had the deceased been alive and a witness against him.

Where such declarations are taken down in writing, at the time they are uttered, although not signed by the deceased, being more reliable and accurate than the memory of most men, they should be produced and read at the trial: *State* v. *Cameron*, 2 Chand. Wis. 172.

The appellant took the stand, and testified in his own behalf. In referring to this fact in its charge, the court used the following language, which the appellant contends was error: "By the statutes of this territory, the defendant is permitted to be sworn and testify in his own behalf. His testimony in the case is subject to, and weighed by, the same rules as the testimony of any other witness. You are bound by it, so far as you believe it true. If you believe that what the defendant states on the stand is false, and a story made up for the occasion, it is your duty to disregard it, so far as it would, if believed, tend to show his innocence, but you may give it such weight as it may, in your judgment, be entitled to, as against his innocence, taking into consideration all the facts and circumstances in evidence before you, of which you are the sole judges."

There was no error in directly challenging the attention of the jury to the appellant as a witness in his own behalf. The instruction is, in all respects, legal and proper. It left the credibility of the appellant as a witness, and the weight of his evidence, to the exclusive judgment of the jury: *People* v. *Cronin*, 34 Cal. 191.

Counsel for the appellant requested the court to instruct the jury: "That the indictment in this case charges that the three defendants held a pistol, and, with a pistol so held, killed the deceased; if the jury find that pistol was held by any one of the three, and not by the other two, the jury should acquit;" which was refused, and this refusal, it is contended, was error.

By Sec. 168, Crim. Prac. Act, it is provided that the distinction between an accessory before the fact and a principal, and between principals in the first and second degree, in case of felony, is abrogated; and all persons concerned in the commission of a felony, whether they directly commit the act constituting the offense, or aid and abet in its commission, though not present, may be indicted, tried and punished as principals. Each of the persons indicted, if guilty, were guilty as principals. The shot of one became the shot of all. It is immaterial which should be charged as principal in the first degree. It was not error to refuse this request.

The affidavits for a new trial referred to by counsel for the appellant, in his brief, are not brought into the record by any statement or bill of exceptions, and are not properly before this court.

The next point made by the appellant is that the jury were allowed to separate during the progress of the trial. The record is entirely silent as to whether such was the fact or not. The only way our attention is called to it is by its being made a point in the brief of the counsel for the appellant. Section 278, Crim. Prac. Act, leaves it discretionary with the court to permit the jury to separate, or to be kept in charge of an officer, during the trial on an indictment. If the record showed that the jury were allowed to separate, there is nothing going to show that it was an abuse of the discretion confided to the court.

The last point made by the appellant is that the formation of the trial jury in this case was contrary to law. The court followed the rule laid down, under a statute from which ours was copied, by the supreme court of California, in *People* v. *Scroggins*, 37 Cal. 676, and which was approved in *People* v. *Russell*, 46 Cal. 121. Upon the authority of these cases, as well as from reason drawn from the statute, no error was committed in forming the trial jury for this case.

Upon the whole record we see no error, and the judgment and order is affirmed.

TWISS, J., concurred.

ZANE, C. J., took no part in this decision.