## STATE v. MARTIN.

No. 5108. Decided July 9, 1931. (300 P. 1034.)

W. C. *Gease,* of Price, for appellant.

*Geo. P. Parker,* Atty. Gen., and *L. A. Miner,* Deputy Atty. Gen., for the State.

FOLLAND, J.

Defendant was convicted of first degree murder, sentenced to life imprisonment, and he appeals. Three questions are presented for decision. First, alleged error of the court in refusing to give an instruction withdrawing from the jury the question of first degree murder; second, refusal of the court to give a requested instruction on credibility of witnesses; and, third, an exception to certain remarks of counsel for the state in his argument to the jury.

The facts are these: The trial was had in May of 1929, while the homicide was committed November 25, 1922. James Pappacostas, the deceased, operated a place variously called the Last Chance Resort or the Last Chance Pool Hall in Helper, Utah. In the front part of the building was a soft drink parlor wherein were card tables, chairs, and a piano. In the rear were a kitchen and several bedrooms. Two girls, Eunice Russell and Ruby Balotis, occupied separate bedrooms in the rear of the building. The deceased lived in an adjoining room, and others occupied rooms in the building. Ruby Balotis was called as a witness and testified that on the morning of the homicide at about 11:30 or quarter of twelve she was in bed in her room, when she heard "someone knocking at Eunice's window, and I got up to look out and see who it was." That she then saw the defendant, Mr. Gibson, and that "he was cursing and told her to open the back door and get her things on and get out." Thereupon Eunice Russell opened the back door and let him in. That: "He came in the back door and went in her room and he and Eunice were arguing, so Mr. Pappacostas went down and told him to be quiet, people wanted to sleep around there; and Mr. Gibson told him he didn't have to be quiet, and kept telling Eunice to get on her coat and

get out, and Mr. Pappacostas told him to leave the place again, so Mr. Gibson told Mr. Pappacostas that he would leave when he got ready, and about that time I heard a shot, and I jumped up and shut my door—. After I heard the shot fired I jumped up and shut my door and as soon as I heard the back door slam I goes out and looks out the back door and Mr. Gibson was running towards the river." That Pappacostas was lying in the hallway where the kitchen was.

She heard three shots fired, but did not see who did the shooting and did not see any weapon in the hands of the defendant. At about the time of the first shot she heard Eunice Russell and Gibson arguing, and then the deceased talking to them, and as the first shot was fired she heard the deceased say, "Don't shoot." On cross-examination she testified as follows:

"Q. Then you say Pappacostas came down here in the doorway of Eunice Russell's room, leading into Eunice Russell's room, and he stood there and had an argument with Gibson? A. Yes, sir.

"Q. Was it a heated argument? A. Yes, sir; a little bit.

"Q. Quite a heated argument, wasn't it? A. Not too much.

"Q. Did you hear any scuffling? A. No, sir.

"Q. Just an argument? A. Yes, sir.

"Q. And then very shortly you heard these shots? A. Yes, sir.

"Q. And you closed your door? A. Yes, sir.

"Q. Quick? A. Yes, sir.

"Q. What did you close the door for? A. Because I didn't know who was shooting or anything.

"Q. You didn't want to get shot yourself, did you? A. No.

"Q. And pretty soon you opened the door again and ran out? A. Yes.

"Q. You say Jim was lying about where the cross mark is? A. Yes, sir. * * *

"Q. You think there were three shots? A. Yes.

"Q. How many times was Jim Pappacostas struck? A. Twice.

"Q. Now, what I am trying to get from you, Mrs. Balotis, is this, whether or not you came to the back door immediately after the last shot was fired? A. Well; yes.

"Q. Just as soon as you could get out of your room to the back door? A. Not just as soon as I could get out of the room to the back door.

"Q. How soon was it? A. Probably a minute.

"Q. He was running wasn't he? A. He fired the third shot from the back door.

"Q. He did? A. Yes, sir.

"Q. He was running when you saw him? A. Yes, sir.

"Q. And if it had been very long that you had delayed in here he would have been out of sight? A. He was almost down to the river.

\* \* \*

"Q. Then how do you know that he fired the last shot from the back door? A. Because the last shot was fired just a second or two before the back door slammed.

"Q. That is why you are telling the jury that it was fired from the back door? A. Yes, sir; and the way it entered.

"Q. Where did it enter? A. Over about here (indicating) in the breadbox in the kitchen.

"Q. Up in there? (Indicating.) Wouldn't it have been possible for him to shoot from near the entrance of-your door and make the same sort of entry into the room? A. I hardly think so.

"Q. Isn't it a fact that you are guessing when you say he shot that shot from the back door? A. Well; he must have fired from the back door; he couldn't have got out the door any quicker.

"Q. You are just assuming that; you didn't see him do it? A. No.

"Q. And you are making a very definite statement before this jury that he did fire it from the back door? A. He couldn't have slammed the door as quick as he did if he fired it from any place else.

"Q. That is why you say he fired it from the back door? A. The back door was opened before the third shot was fired."

This witness further testified that she had seen the defendant twice at the Last Chance Resort the day before the homicide, and had talked with him, that he had come there to talk with Eunice Russell, and that the last time he was there was shortly before 3 o'clock on the morning of November 25th. It seems that about six months before the trial of this case a man named H. O. Phillion under the name of Jack Gibson had been charged with the killing of Pappacostas, but at some stage of the proceeding the cause was dismissed as to him. These facts were developed on cross-examination of the witness Ruby Balotis, who testified:

"Q. And you came into Court about six months ago and told another jury that Phillion was the man, didn't you? A. I did. \* \* \*

"Q. And you not only testified that Phillion was the man who killed

Pappacostas, but you went through the details as you have done it in this case, didn't you? A. Yes, sir. * * *

"Q. You remember testifying at the former trial, and upon being asked a question as to whether or not Phillion was the man who you saw in the Last Chance Resort on the day in question and the man who killed Pappacostas, you said that he absolutely was, and that he looked like a criminal more than any man you had ever seen; do you remember saying that? A. Yes, sir."

The witness was shown a photograph of Mr. Phillion, whom she identified as the man she had seen in the courtroom. On re-direct examination she testified:

"Q. You testfied at a former trial, Mrs. Balotis, in which a man charged as Jack Gibson, but who gave his name as H. O. Phillion, was the defendant, did you not? A. Yes, sir.

"Q. And you stated you believed he was the man? A. Yes, sir.

"Q. Now you have stated that this is the man? A. Yes, sir."

And on recross-examination:

"Q. You didn't say at the former trial that you believed Phillion was Gibson, did you; you said that he was Gibson? A. Yes, sir.

"Q. And you said further that he looked more like a criminal than any man you had ever seen? A. I may have.

"Q. Well, you just a little while ago stated you did say that, isn't that right? A. I said I thought Gibson looked more like a criminal than anybody I ever saw when I first saw him. * * *

"Q. And the question was asked you if your memory might not be somewhat impaired after six years of not having seen the man, and you said, 'No, I would know that man wherever I saw him, and that is Gibson?' A. I don't recollect it just now.

"Q. You don't recollect it just now? A. No.

"Q. But you did positively identify Phillion as Gibson? A. Yes; until I saw Mr. Gibson."

The physician who was called immediately after the shooting testified to examining the body of Pappacostas and that he was dead when the examination was made. He found one bullet wound through the chest and one through the upper part of the left leg. Death was caused by the wound in the chest.

Another witness, Bill Batonis, testified that on the day of the homicide he was crossing the river on his way to Helper when he heard two shots; that he at once went to the Last Chance Resort and there saw Pappacostas lying dead; that he immediately left and went back of that place toward the river where he saw a man with a gun, who, when asked why he killed the man, told the witness to stay back, which he did; that the man he saw with the gun was the defendant Martin; that he had seen him in Helper a couple of times before that. On cross-examination he was asked if he saw any one come out of the back door of the Last Chance Pool Hall after hearing the shots. His answer was "I no see anybody; I see the man stay there; I see a man standing there; I don't know; I no see anybody come out of the door."

The witness Harry Mahleres testified that in January prior to the trial he was on the train between Provo and Price, and that he saw the defendant with the sheriff on the train; that:

"I tell him, 'Hello, Blackie,' and he says, 'Hello, Harry.'

"Q. Then what was said, if anything? A. And I told him—he says how he been caught and stuff like that and he told me he been caught in a certain place.

"Q. Did he say where? A. He told me some place, but I don't know whether I remember it or not.

"Q. Then what was said, Mr. Mahleres? A. I tell him a few words on the killing stuff, for this murder.

"Q. What were the words? A. Well; I tell him, 'Blackie, I kind of feel sorry about it; why you kill this man and now you been caught' and he says, 'Harry, I don't intend to kill Jim; I don't intend it, but I don't know how I done it,' and of course I promise to him not to come here, and I kind of sorry to be on the witness stand; I promise to him, and it is breaking my word now. I don't like to come to the witness stand at all."

## And on cross-examination he testified:

"Q. Just a moment; did you offer to do anything for the defendant when you saw him on the train in the way of helping him? A. I tell him if I can help him I would help him.

"Q. And you promised to help him? A. Yes.

"Q. And with that he told you he killed this man and he didn't intend to kill him? A. Yes."

The defendant did not take the stand, and the witnesses produced for the defense testified to conversations, the dimensions and location of buildings, location of other objects, and distances, with the apparent purpose of discrediting the witnesses for the state.

The first assignment of error presented by the defendant is that the court erred in refusing to give defendant's requested instruction No. 1. The first part of the request is merely the statutory definition of murder in the first degree, and was given by the court. The last ▮▮▮ paragraph, which was refused, is as follows: "In this case, no evidence has been produced by the prosecution tending to prove the defendant guilty of first degree murder. You are, therefore, instructed that you are precluded in this case from rendering a verdict of first degree murder against the defendant."

Another assignment which goes to the same point is that the court erred in refusing to grant a new trial on the ground that the evidence was insufficient to sustain the verdict, and that the verdict is contrary to law. Defendant's argument under these headings is based on the following taken from defendant's brief:

"The testimony of the state's witnesses Harry Mahleres and Ruby Balotis, showed that the crime committed, if any, was not murder in the first degree, the first witness taking the element of intent without the case and the second witness proving a provocation and heat of passion immediately prior to the alleged shooting. * * *

"The testimony of Ruby Balotis showed that a fight occurred between James Pappacostas and the defendant immediately prior to the alleged slaying. Malice being presumed after the corpus delicti was proved, the defendant was relieved of proving any fact going to disprove malicious intent. The state having shown facts which tended to reduce the degree of the crime from first degree murder to a lesser degree. It was not necessary for the defense to introduce testimony showing lack of malice and lack of premeditation."

Counsel for defendant in his brief refers to section 8986, Comp. Laws Utah 1917, which is the same as section 268 of the Criminal Act of Utah of 1878, and reads as follows:

"Upon a trial for murder, the commission of the homicide by the defendant being proved, the burden of proving circumstances of mitigation, or that justify or excuse it, shall devolve upon him, unless the proof on the part of the prosecution tends to show that the crime committed amounts only to manslaughter, or that the defendant was justifiable or excusable."

He cites *People* v. *Tidwell*, 4 Utah 506, 12 P. 61, and *People* v. *Callaghan*, 4 Utah 49, 6 P. 49, wherein that section is considered. Later decisions, however, to the advantage of defendant, have greatly modified, if not entirely repudiated, the construction given that section in the cases cited. *State* v. *Vacos*, 40 Utah 169, 120 P. 497; *State* v. *Dewey*, 41 Utah 538, 127 P. 275, 279. In the latter case it was said:

"Of course, it is not essential that the intent and malice be shown by direct evidence. They may be presumed from the fact of the killing, where no attendant and explanatory facts and circumstances are shown; and where the attendant facts and circumstances of the killing are shown, they may be inferred as inferences of fact. There is abundant authority for holding that where the killing is proved, and no accompanying circumstances appear in evidence, the law presumes that the killing was done maliciously. But the law in this country is also about as well settled that, where the attendant facts and circumstances of the killing 'are shown in evidence, whether on the part of the prosecution or the accused, the character of the killing is to be determined by considering them, and it is then not a matter for presumption which operates in the absence of explanatory evidence, but for determination from the circumstances shown in evidence.' 21 Cyc. 875-880, and cases therein cited."

The kind and degree of provocation necessary to warrant such a reduction in the charge is stated in 29 C. J. 1131, as follows:

"While, as has been noted, the grade of a felonious homicide committed upon sudden heat of passion aroused by adequate provocation is reduced from murder to manslaughter, neither passion alone, however violent, nor provocation alone, however adequate,

will have this effect. Further, the provocation which must have been present must be such as the law deems adequate to produce the degree of passion required to mitigate the crime. The word ordinarily employed to describe this character of provocation is 'adequate,' although it is also described a 'considerable,' or 'reasonable,' or 'legal,' or 'lawful,' and all of these expressions have been said to be interchangeable and synonymous. The provocation must be of such a character as would naturally or reasonably arouse the passion of an ordinary man, beyond the power of self control, or to the highest degree of exasperation, and it should be real or so apparent as to justify the assumption of its reality. A slight provocation will not be adequate, since the provocation must be proportionate to the manner in which defendant retaliated; and therefore, if defendant, upon a slight provocation, attacked deceased with violence out of all proportion to the provocation and killed him, the crime is murder, although there was no prior intent to take life. This is especially true if the homicide was committed with a deadly weapon. In such cases there must be some great provocation to reduce the grade."

In this case, the attendant facts and circumstances are shown, though meagerly, in the testimony of Ruby Balotis. We have quoted substantially all of this testimony which tends in any way to explain the circumstances of the killing of Pappacostas. There is nothing here from which it may reasonably be inferred that the deceased and defendant engaged in any fight or combat as asserted by counsel for defendant. The defendant went to the place where Pappacostas had his home and business, and, though no witness so testified, the fair inference from the evidence is that he was armed when he went there, and the jury were justified in concluding that whatever dispute or wordy altercation resulted was provoked by defendant. The defendant was advised by decedent to keep quiet, that people around there wanted to sleep, and, when the defendant replied that he did not have to keep quiet, he was requested to leave the place, and the defendant replied that he would leave when he got ready; that immediately thereafter, without any further provocation on the part of the deceased, shots were fired; that immediately before the shooting of the deceased he said, "Don't shoot." We think there is

sufficient shown to support the verdict of the jury that the killing was done with malice aforethought and after deliberation and premeditation. There is a total want of proof of such provocation for the shooting as would require the court, as matter of law, to mitigate or reduce the charge from first degree murder to either murder in the second degree or to manslaughter and withdraw from the jury the charge of first degree murder. From the facts and circumstances in evidence it was for the jury to determine whether or not the essential elements of malice, intent, premeditation, and deliberation were present in this case, and, having so found by their verdict of first degree murder, we cannot say, as matter of law, that the verdict is not supported by the evidence.

Counsel for defendant urge that the statement of defendant testified to by Mahleres that, "I don't intend to kill Jim, I don't intend it but I don't know how I done it," took out of the case the element of intent. With this contention we cannot agree. The testimony of Mahleres ■ tended to prove the identity of this defendant as the man who did the killing. The admissions of the defendant contained disserving as well as self-serving elements. "The conversation containing the admission by accused must be considered by the jury in its entirety. They are not bound, however, to believe the whole statement, but may reject as much of it as they disbelieve." 16 C. J. 635. The rule is stated in *State* v. *Romeo,* 42 Utah 46, 128 P. 530, 536, as follows:

"The law on the subject is as stated in 16 Cyc. 1041, where it is said that the self-serving part of an entire statement admitted in evidence should be duly considered and weighed with the unfavorable part, but that all parts of the statement are not necssarily to be regarded as worthy of equal credit. Of course, in an entire correlated statement the self-serving portion should be considered with the disserving, but, as stated, both are not necessarily to be regarded of equal weight or credit."

Testimony that the accused said he did not intend to kill, where received as part of a conversation in the nature

■

of an admission, is competent to be received, and must be considered and weighed by the jury in connection with all the other facts and circumstances in the case. His declaration of lack of intent is not at all conclusive. Although a defendant may testify directly as to his motive or intent in doing the act charged against him as a crime, *State* v. *Sawyer*, 54 Utah 276, 182 P. 206, it is always for the jury to ascertain the motive or intent with which the act is done, by a consideration of all the facts and circumstances in evidence, 30 C. J. 152.

Error is assigned because of the court's refusal to give defendant's requested instruction No. 10, which reads as follows:

"You are instructed that the testimony of a witness making contradictory statements goes to such witness' credibility; and that prior inconsistent statements of a witness also goes to such witness' credibility; and that prior inconsistent statements of a witness also goes to affect such witness' credibility."

This request was undoubtedly prompted by the testimony of Ruby Balotis, wherein she admitted that at the trial of H. O. Phillion some months previous, he being charged under the name of Jack Gibson with the murder of Pappacostas, she had identified him as Gibson, the man whom she had seen at the Last Chance Resort at the time of the homicide. We have hereinbefore set out her testimony on this point, and it is apparent from a reading of the record that she gave substantially the same account of the transaction at both trials, and that in each instance she identified the defendant then on trial as the person involved in the homicide. The request is not happily worded, nor is it free from ambiguity. What was intended by it was probably to have the court instruct the jury that: "The fact that a witness had previously made statements inconsistent with or contradictory to his testimony is proper to be considered as bearing upon or affecting the credibility of such witness." But even this is not a full

and adequate statement of the rule which should be given to the jury if anything more specific or definite than the general charge with respect to credibility is requested or given. An instruction embodying a correct and full statement of the law on the question of credibility would, under the circumstances, have been proper, and, on request, should have been given by the court. *State* v. *Brown,* 48 Utah 279, 159 P. 545, 556.

The rule of law upon which defendant relies in his brief, and which is also quoted with approval in *State* v. *Brown,* is the following from 40 Cyc. 2762:

"The fact that a witness has made statements inconsistent with or contradictory to his testimony is proper to be considered as bearing upon his credibility, even though the jury do not believe that the testimony thus contradicted was intentionally false. But proof of such statements is only evidence tending to impeach the witness, leaving it for the jury to determine under proper instructions whether the impeachment has been successful, and to what extent the credibility of the witness is affected and does not require that his testimony be rejected. So the jury may believe the witness notwithstanding his contradictory statements, even though his testimony is not corroborated. On the other hand a witness' contradictory statements may justify the jury in not believing him, although they should not disregard or refuse to consider his testimony unless they consider it willfully false, even though it is not corroborated."

A comparison of the requested instruction No. 10 with the above statement from Cyc., and with the instructions approved in *State* v. *Brown,* supra, shows wherein it fails to properly advise the jury of their rights and duties with respect to the credibility and weight of the testimony of witnesses. The general rules which are ordinarily sufficient to guide the jury in its judging of the credibility and weighing of testimony were given by the court in its instructions Nos. 23 and 24, wherein the jury were told:

"You are not bound to believe or give weight to the testimony of any witness, unless it satisfies your judgment as to its truth. * * * If you believe that any witness, who has testified before you, has wilfully and knowingly testified falsely as to any material fact in the case, you are at liberty to disregard the whole of the testimony

of such witness, except as it may be corroborated by other credible witnesses or credible evidence in the case, or you may give to the testimony of such witness, on other points, such weight as you may deem it fairly entitled to.

"You are instructed, gentlemen of the jury, that you are the sole judges of the facts, of the credibility of the witnesses and of the weight to be given to their testimony. In determining the weight to be given to the testimony of the different witnesses who have testified in this case, you should take into consideration their feelings, or bias, if any has been shown; their demeanor while testifying; their intelligence or lack of intelligence; their means of information or knowledge with reference to the matters testified to; the apparent fairness or want of fairness; the interest, if any has been shown on the result of the trial, and the reasonableness of the testimony of the different witnesses; and from all· the facts and circumstances given in evidence before you determine what weight should be given to their testimony."

In the absence of a proper request, these general instructions were sufficient. 16 C. J. 1015; *State* v. *Weber,* 204 Iowa 137, 214 N. W. 531. We can see no prejudice to any substantial right of the defendant in the failure of the court to instruct in language any more specific or particular than is given in the charge. The witness Ruby Balotis was corroborated in her identification of this defendant as the man concerned in the homicide by other witnesses. The only material idea included in the request which was not definitely and specifically set out in the charge to the jury is that conflicting statements by a witness may be considered as affecting credibility. This matter was so definitely brought out in the examination of the witness, and the fact that such a conflict may affect credibility is so well known to all persons, that it is something which every juror of ordinary intelligence would have in mind without being reminded by the court. However, the court instructed the jury that from all the facts and circumstances given in evidence they should determine the weight to be given the testimony.

The last assignment is as stated in defendant's brief, that: "The court erred in permitting the district attorney

to say, in effect, in his closing argument to the jury that he did not believe Phelps when he testified in ▮ the Phillion case and identified Phillion as the murderer, the district attorney not having been a witness in the case at bar and no testimony as to his belief appearing in the record."

This, it is claimed, was not only erroneous, but prejudicial. The record shows that in the course of his argument to the jury the district attorney made the following statement:

"They have told you what Phelps said, although there is no testimony of Mr. Phelps before you; but inasmuch as they have told you about it, I think I have a right to tell you something about it. I didn't believe the man Phelps when he testified, because his description didn't fit—"

Objection was made by counsel for defendant, and upon the court saying, "I think you may go on," defendant noted an exception. After the argument, and after the jury had retired, the following occurred:

"Mr. Kelly (counsel for defendant): I don't think the reporter got all your statement that we objected to; can you state it into the record, Mr. Keller?"

"Mr. Keller (district attorney): The record may show that Mr. Kelly, in his argument to the jury, related briefly the identification made by one William C. Phelps at a former trial of one H. O. Phillion; that the District Attorney, answering the argument of Mr. Kelly, in his closing argument to the jury, told the jury that he had not produced the witness Phelps to testify at the present trial for the reason that he had no confidence in his testimony and because he didn't believe his testimony on the former trial."

Counsel for the defense in their argument to the jury first introduced the subject of Phelps' testimony at some other trial. There is no evidence in the record with respect to what Phelps testified to at the Phillion trial, and he was not a witness in the present case. The reference to him in the testimony is that he was a bartender, had a room in the Last Chance Resort, was somewhere about the place at

the time of the shooting, and was present immediately after the homicide. It was, of course, improper for the district attorney to refer to extraneous matter in his argument to the jury, notwithstanding it had been referred to in argument by counsel for the defense. The district attorney should have objected at the time it was so referred to and moved the court to exclude it from the consideration of the jury. This, however, was not done. If defendant's counsel committed an impropriety in referring to the testimony of a witness at another trial, that is no excuse for the district attorney committing a similar impropriety. The rule applicable, however, has been well stated in Corpus Juris as follows:

"But as a general rule remarks of a prosecuting attorney which ordinarily would be improper are not ground for exception if they are provoked by defendant's counsel and are in reply to his acts or statements, unless such remarks go beyond a pertinent reply and bring before the jury extraneous matter touching important issues." 16 C. J. 911. See, also, *People* v. *Gerndt*, 244 Mich. 622, 222 N. W. 185; *Siberry* v. *State*, 133 Ind. 677, 33 N. E. 681; *People* v. *Philbon*, 138 Cal. 530, 71 P. 650.

The district attorney in his argument did not go beyond making a reply or explanation which had, in his opinion, been required by the argument of other counsel. We see nothing in the incident of a prejudicial or inflammatory nature. Upon objection of counsel, the district attorney immediately abandoned the subject, and, so far as the record shows, made no further reference to it until after the retirement of the jury and outside of their presence, when, at the request of the attorney for the defendant, the district attorney restated, for the purpose of the record, the substance of what he had stated in his argument. While, because of the nature of this case, we have considered this objection, the rule is that an appellate court is not required to pass on such an objection to remarks of counsel in argument, where no motion or request is made to the trial court to have the remarks withdrawn from the consideration of

the jury or to instruct the jury not to consider the same. 16 C. J. 915; 17 C. J. 71. The trial court did, however, in his charge to the jury instruct that any remarks of counsel or other statement not in accord with the evidence introduced or proper inference to be drawn from the evidence should not be considered but should be wholly disregarded. There was no such abuse of privilege by the district attorney or error by the court as to justify a reversal of the case upon this ground.

We find no error in the record affecting the substantial rights of the defendant, or which prevented him from having a fair trial.

The judgment is affirmed.

CHERRY, C.J., and STRAUP, ELIAS HANSEN, and EPHRAIM HANSON, JJ., concur.