# STATE v. COBO.

No. 5502. Decided September 23, 1936. (60 P. [2d] 952.)

*Chris Mathison,* of Salt Lake City, and *P. J. Sanders,* of Nephi, for appellant.

*Joseph Chez,* Atty. Gen., and *Zelph S. Calder,* Deputy Atty. Gen., for the State.

EPHRAIM HANSON, Justice.

The information upon which the defendant, Pete Cobo, was tried for murder charged that on May 18, 1933, at Juab county, Utah, the defendant willfully, unlawfully, feloniously, and of his malice aforethought by some means unknown, instruments and weapons, struck one Frank G. McIntyre upon the head and face, thereby causing his death. A jury found the defendant guilty of voluntary manslaughter. Defendant on this appeal contends that the state failed to prove the corpus delicti; that there is no substantial evidence that

the death of the deceased was caused by blows struck or wounds inflicted by the defendant; that there is no substantial evidence that the defendant struck or beat the deceased with intent to kill him; that there is no substantial evidence that the defendant struck and beat the deceased with any instrument or thing which was likely to produce death or great bodily injury; that the court misdirected the jury in certain particulars and failed to properly instruct the jury with regard to the charge of manslaughter.

We cannot agree with the contention of appellant that the state failed to prove the corpus delicti. The evidence shows that an altercation between the defendant and the deceased occurred between 8:00 and 9:00 o'clock on the night of May 18, 1933; that defendant and the deceased were engaged in a fistic encounter; and that while so engaged, the deceased slumped to the ground. Efforts were made to revive him, but he died within a short time. A physician was called about 11:00 o'clock and pronounced him dead. The body was taken immediately to an undertaking parlor, where at about 1:00 a. m. two physicians examined the body and noted that there were some bruises on the left side of the face, a bruise and contusion on the left side of the chin, a slight cut on the left lower lip, a slight scratch on the right side of the face, and a bruise at the back of the head. An incision was made, the scalp pulled back, the top of the skull removed, and the brain examined and removed. The physicians found that death was due to a subdural hemorrhage caused by external violence to the face and head. The physicians who made the examination were competent and qualified to determine that death was due to a subdural hemorrhage. Having thus concluded what death was due to, it was unnecessary to make an examination of other vital organs.

The evidence is sufficient to show that whatever violence was inflicted on the body of the deceased was inflicted from blows struck by defendant in the encounter or fight. The fact of death being shown, and evidence to show that the

cause thereof was from blows struck by defendant, sufficiently established the corpus delicti, the body of the alleged crime, to the same effect, though in less degree, where the state shows the death of another caused by a gunshot wound inflicted by the accused.

The particular contention here made by the defendant in such respect is that it was not sufficiently shown that the death was caused from the blows or violence inflicted by defendant on the body of the deceased; that is, not sufficiently shown that the death was due to such or any external violence. But the testimony of the physicians who made the autopsy is to the effect that the subdural hemorrhage—the immediate cause of death—could be and probably was produced from the infliction of violence as shown by the character of the bruises and contusion on the chin, on the back of the head, and on the face of deceased; that is, the force and extent of violence inflicted to produce such character of bruises and contusions could and probably did produce the subdural hemorrhage. We think the corpus delicti was sufficiently established. "Corpus deliciti" as applied to homicide cases means the fact of death and the criminal agency of another person as the cause thereof. *Shaw, Chief Justice, in Commonwealth* v. *Webster,* 5 Cush. (Mass.) 295, 52 Am. Dec. 711, Bemis' Rep. 473, says:

"In a charge of criminal homicide, it is necessary in the first place by full and substantial evidence to establish what is technically called the 'corpus delicti,'—the actual offense committed; that is, that the person alleged to be dead is in fact so; that he came to his death by violence and under such circumstances as to exclude the supposition of a death by accident or suicide and warranting the conclusion that such death was inflicted by a human agent; leaving the question who that guilty agent is to after consideration."

See, also 30 C. J. 139, § 346, and cases cited; 13 R. C. L. 736; *People* v. *Jones,* 123 Cal. 65, 55 P. 698; *McBride* v. *People,* 5 Colo. App. 91, 37 P. 953; *State* v. *Millmeier,* 102 Iowa 692, 72 N. W. 275; 4 Wigmore on Evid. (2d Ed.) § 2072, and cases cited.

As to whether or not the evidence is sufficient to sustain the verdict of manslaughter presents a more serious question. We shall briefly review this evidence. The defendant resides at Eureka, Utah. On May 17, 1933, Mrs. Cobo, the wife of defendant, had given birth to a baby. In the evening of May 18th, defendant Pete Cobo and a number of his friends were in the dining room of the Cobo home celebrating the birthday event by imbibing freely of intoxicating liquor. About 8:30 p. m. of May 18th, Frank G. McIntyre, the deceased, together with one Horace Hillman, both of whom had been drinking heavily, came to defendant's home and joined the defendant and others in the dining room. Upon entering, McIntyre asked for some liquor, but defendant declined to give him any. McIntyre began talking loudly and, using some profanity, repeated that he wanted some liquor. The defendant again refused. An attendant, Mrs. Osborne, came out of Mrs. Cobo's bedroom, which adjoined the dining room, and requested that McIntyre make less noise as Mrs. Cobo was sick. McIntyre quieted down for a short time, then repeated that he wanted some liquor, and again the defendant replied that he did not have any.

McIntyre left the room but returned in a few minutes with a jug in his hand and with an oath said that he did not want any of the defendant's liquor; that he had some of his own. The jug fell out of his hands. The defendant picked it up, stating that he would break it. McIntyre requested the defendant not to break the jug and defendant then handed it to him and said, "Well, take it and go home." The defendant turned to Hillman and said, "You go, too." McIntyre and Hillman left the house and got into McIntyre's automobile, which was parked in front of the home. When McIntyre and Hillman left, defendant slid the bolt on the dining room door. Within a short time McIntyre returned and began hammering on the dining room door. The defendant asked who it was. McIntyre replied that it was he and asked that defendant open the door. Defendant refused and told McIntyre he had better go home. McIntyre stated that he

was not going home, and defendant then said: "You better go some place; get away from here, I don't want any more noise." McIntyre made an insulting reply, and defendant turned out the lights and asked those in the room to keep quiet. The hammering on the door continued. While the lights were out, defendant walked over to the door, slid back the bolt, and opened the door part way. At that time Mc-Intyre was at the door with a chair in his hand which he had no doubt used to hammer on the door. Defendant pushed McIntyre out of the doorway, turned on the lights, and immediately went outside.

Mrs. Osborne also stepped outside, took the chair from McIntyre, and returned inside the house. McIntyre and defendant met outside the house in close proximity to defendant's car, which was also parked near the home, and began fighting. They continued striking at each other with their fists until finally McIntyre, having been struck two or three times in the face by defendant, suddenly sank to the ground and apparently collapsed. When McIntyre collapsed, defendant came to Hillman, who was sitting in McIntyre's car, and told him to take McIntyre home; that he did not want him around there any more. Defendant returned to the dining room and stated to those therein that he weighed about 145 pounds but that he had a "dynamite left," or was "full of dynamite," or words to that effect, but made no reference to any trouble that had occurred outside. Some of the guests then left the Cobo home. As they were leaving, they saw Hillman holding the head of McIntyre, who was lying on the ground not far from the house. They asked Hillman if McIntyre was all right, to which Hillman replied that he was. A few scratches and bruise marks were observed upon McIntyre's face and chin, but these attracted no particular attention. A cup of water was poured on Mc-Intyre's face in an effort to revive him. Some of the party felt McIntyre's pulse and concluded that he would be all right in a short time, so continued on their way, and Mc-Intyre was left with Hillman. In a short time, Hillman con-

cluded that McIntyre was dead and immediately left for Mammoth, which is a few miles from Eureka, to notify friends of the deceased. Other people going to the Cobo home, seeing the body of McIntyre still lying on the ground and not knowing that he was dead, but believing that he was in an intoxicated condition, placed the body in the McIntyre car. About 11:00 o'clock a physician was called who made an examination and pronounced McIntyre dead. About two hours thereafter the autopsy was held disclosing that the deceased had died from a subdural hemorrhage, as heretofore set forth.

It is the theory of the state that the blows which caused the death of McIntyre were made by some kind of instrument, either a club, brass knuckles, or some other such instrument, and were not made by the fists of defendant. We have carefully examined the record, and we can find no evidence to sustain this contention. All the witnesses, both for the state and for the defendant, agree that at no time while defendant was in the house did he have anything in his hand; that at the time he left the house and went outside he had no weapon of any kind, so far as the evidence discloses. Those who witnessed the encounter on the outside are quite clear that defendant was striking the deceased with his fists, and they saw no weapon of any kind.

The physicians and surgeons who examined the deceased and performed the autopsy described the bruises and marks on the deceased's face and head. Their description coincides with that of the other witnesses, and it is quite evident from the description which was given that all of the marks and bruises on the deceased's face were not made by any weapon. These physicians were quite certain that death was caused by hemorrhage of the brain resulting from external violence on the chin or jaw. That a blow struck by the fist to the chin or jaw might under certain circumstances cause death cannot be disputed.

Is this sufficient evidence to sustain a conviction of voluntary manslaughter? Section 103-28-5, R. S. Utah 1933, defines "manslaughter" as follows:

"Manslaughter is the unlawful killing of a human being without malice. It is of two kinds:

"(1) Voluntary, upon a sudden quarrel or in the heat of passion.

"(2) Involuntary, in the commission of an unlawful act not amounting to a felony, or in the commission of a lawful act which might produce death, in an unlawful manner or without due caution and circumspection."

This statutory definition is but declatory of the common law. At common law, to constitute voluntary manslaughter the killing must be willful or intentional, or there must exist an intention at least to do great bodily harm. The intention may be inferred from the use of a deadly weapon, but if the weapon is not deadly the intent to kill cannot be inferred, but must appear from other and additional evidence. 29 C. J. 1128, § 116, and cases cited; 13 R. C. L. 785, § 90, and cases cited. Our statute was copied from California, and in that state it has been held that in order to constitute voluntary manslaughter the intent to kill must exist, a killing without malice or intent to kill, in the commission of an unlawful act not amounting to a felony, constitutes involuntary manslaughter. *People* v. *Miller*, 114 Cal. App. 293, 299 P. 742. In construing an identical statute, the Supreme Court of Arizona held that an intent to kill was a necessary element of voluntary manslaughter. *Harding* v. *State*, 26 Ariz. 334, 225 P. 482.

There is no evidence of any ill feeling or enmity on the part of the defendant against the deceased. In fact, the evidence is to the contrary and shows that the men, prior to the trouble in question, were friends. The evidence is further undisputed that defendant and deceased were striking at each other with their fists and that neither was using any weapon of any kind upon the other;

that the blows that were struck by the defendant were not such as were likely to cause death or do great bodily injury. The defendant did not beat the deceased in a vicious, deadly, or barbaric manner. Had he done so, though using nothing but his fists, a different result might be reached. The defendant at no time struck the deceased except while both were on their feet, and as soon as McIntyre collapsed and sank to the ground, the defendant ceased striking. A case quite similar in fact is that of *People* v. *Munn*, 65 Cal. 211, 3 P. 650. In that case, the defendant struck the deceased with his fists, fracturing his skull, from which death resulted the following morning. There was no intent on the part of the defendant in that case to kill the deceased and nothing was used but his fists. In reversing a conviction of murder in the second degree, it was held that the evidence could not sustain a conviction of anything more than involuntary manslaughter. We believe the great weight of authority is that an unintentional killing, resulting from an unlawful assault and battery which in and of itself is not of a character to cause death, is held to constitute involuntary manslaughter under statutes such as ours. See 29 C. J. 1150, § 137, and cases cited.

It is quite clear from all the evidence that the death of McIntyre resulted from an unlawful assault and battery, not of a character of itself likely to cause death, and that death unintentionally resulted. The evidence as disclosed by the record would not warrant a finding that the defendant was guilty of anything more than involuntary manslaughter.

As already indicated, an intent to kill is not inferable from the fistic encounter itself, nor from the facts and circumstances leading up to the encounter. Upon the deceased entering the defendant's residence in an intoxicated condition and being refused when he demanded liquor, because of such refusal he became boisterous, used loud and profane language, and he and not the defendant became vexed and resentful and apparently in an angry mood. So far as disclosed

by the evidence, the defendant in a rather quiet, though perhaps firm, manner several times told the deceased he could not have any liquor, asked him not to make so much noise and to leave the premises. The deceased in a rather abrupt if not in an angry, in a vexed and resentful manner left, stating that he had liquor of his own and that he would go and get it. There is not anything made to appear that the defendant either by speech or conduct manifested any resentment or angry feeling or any vexed feeling other than to have the deceased stay away. When the deceased departed, defendant bolted the door to prevent him from re-entering. Shortly thereafter the deceased returned and, finding the door locked or bolted, began pounding on it and demanded that he be let in. The defendant told him he could not come in, that the defendant had no more liquor, and that he would not let the deceased have any and told him to make no further disturbance and to go home. The deceased declined to do so and continued to pound and beat upon the door, demanding that he be permitted to enter. Defendant thereupon had the lights of the room turned on, they having been turned off after the deceased left, opened the door, and went outside when the fight started shortly thereafter. The evidence does not disclose what, if anything, was said by either the defendant or the deceased after the defendant went outside or before the fight started, nor does it show who started the fight or who made the first assault, whether the deceased or the defendant. The fight itself lasted but a few minutes or seconds, only a few blows having been struck, and so far as disclosed by the evidence only with the hands or fists and without the use of any weapon or instrument of any kind.

After the fight ended, defendant told the companion of the deceased that he did not want the deceased about the premises any longer and to take him home. All who witnessed or saw any part of the fight, including the companion and friend of the deceased, thought and believed that the deceased was merely "knocked out" and that he would be revived in a few minutes. Water was applied to his face,

several persons felt of his pulse, and reached the conclusion that the deceased would soon revive and would be all right. Later the deceased was lifted from the ground and put into his automobile. His companion, however, was not able to drive the car. A doctor was sent for and arrived in an hour or two after the fight. He pronounced the deceased dead.

Thus, there is not anything from the manner of the fight or from circumstances leading up to it to justify a finding or an inference of any intent on behalf of the defendant to kill the deceased. However, to show such intent the state called two witnesses, neither of whom witnessed the fight or had any knowledge of the circumstances thereof and who appeared on the scene about an hour after the fight occurred, one of whom testified that while looking at the deceased in his automobile he asked the defendant, "Do you know anything about this?" and the defendant answered, "Yes, he (the deceased) came in here, and we had a fight," and that then the defendant stated, "You would not think a fellow my size (defendant weighing about 145 pounds and the deceased more than 200 pounds) could handle a fellow as big as that, would you?" The witness then said, "Did you handle him, Pete?" to which the defendant replied, "You bet, I only weigh 145 pounds, but believe me boy, I am dynamite." Then the witness said to the defendant, "He (the deceased) is in pretty bad shape. He is dead. You have killed him," and the defendant then said: "If he isn't dead, I'll kill him. You may be the U. S. Marshal for all I care, I am not afraid of the electric chair."

The other witness testified. He asked the defendant what he knew about it, and the defendant stated that they "had had a fight," whereupon the witness stated to the defendant, "Do you know that he is dead? Did you kill him?" and that the defendant said that if he was not, that he would kill him. And then stated that he (the defendant) weighed only 145 pounds, but that he was just the same as that much dynamite.

The dominant factor of such declarations reflect a characterization more like a braggadocio, or empty vaunting of a pugilist, than of any past or present state of mind or intent *at the time of the fight*. The declarations are not even admissions that the defendant killed the deceased, much less with what motive, purpose, or intent that the deceased was killed, or that the defendant engaged in the fight or encounter with a purpose, motive, or intent to kill the deceased, nor do such declarations dispel the want of any such intent, as indisputably shown by the facts and circumstances leading up to the fight, and by the nature and character of the fight indulged in between the deceased and the defendant while both under the influence of intoxicants, and indulged in only with hands and fists without weapons or instruments of any kind and not in a cruel or inhuman manner or under circumstances likely to produce death, and in which the unlawful act committed by the participants amounted merely to a misdemeanor and not a felony.

Complaint is made of the following instruction given by the court on the subject of voluntary manslaughter:

"Before you can find the defendant guilty of voluntary manslaughter, as charged in the information, you must be convinced beyond a reasonable doubt of the following elements:

"(1) That Frank G. McIntyre was killed on or about the 18th day of May, 1933, at Juab County, State of Utah.

"(2) That said killing was the direct result of the said Frank G. McIntyre being beaten on, over, in or upon the head and face by the defendant, Pete Cobo, with some means unknown, instruments or weapons.

"(3) That said killing by the said Pete Cobo, if you believe he killed said Frank G. McIntyre, was upon a sudden quarrel or in a heat of passion.

"It is not enough that one or more of these elements be proven to your satisfaction beyond a reasonable doubt, but all of said elements must be established beyond a reasonable doubt before you can find the *defendant guilty of murder in the first degree, as charged in the information.*" (Italics ours.)

No exception was taken by counsel for the defendant to

the giving of the instruction. It, however, is assigned as error. We recognize the well settled general rule in this and in other jurisdictions that alleged errors with respect to instructions and in refusing requests to instruct ordinarily will not on appeal be considered or reviewed, unless sufficient exceptions thereto were taken in the court below by the party aggrieved. Such rule, however, is not uniform as to all errors so committed. In many jurisdictions there are well recognized exceptions to the general rule, especially in criminal cases involving capital offenses or other grave and serious offenses of long term imprisonment, and sometimes has been applied even in civil cases, when palpable error on the face of the record involved violations of fundamental rights and privileges of manifest prejudice to the party aggrieved. 3 C. J. 1342. In 17 C. J. 181, it is said that:

"In capital cases the court may take notice of errors apparent upon the record affecting the substantial rights of the prisoner on his trial, although not made a ground of appeal."

In the case of *Wiborg* v. *United States,* 163 U. S. 632, 16 S. Ct. 1127, 1137, 41 L. Ed. 289, 290, Mr. Chief Justice Fuller said:

"No motion or request was made that the jury be instructed to find for defendants, or either of them. Where an exception to a denial of such a motion or request is duly saved, it is open to the court to consider whether there is any evidence to sustain the verdict, though not to pass upon its weight or sufficiency. And, although this question was not properly raised, yet if a plain error was committed in a matter so absolutely vital to defendants, we feel ourselves at liberty to correct it."

To that effect also is the case of *Clyatt* v. *United States,* 197 U. S. 207, 209, 25 S. Ct. 429, 49 L. Ed. 726. In the case of *Skuy* v. *United States* (C. C. A.) 261 F. 316, 320, Circuit Judge Sanborn said:

"The contention that proper objections were not made, and proper exceptions were not taken, to permit the consideration in this court of the issues which have been discussed, has not escaped attention, but it fails to convince. [Citing cases.]"

"And even if it were tenable, this is a trial for an alleged crime, it involves the liberty of a citizen, and the fault in the trial is so radical that it may well be noticed and corrected by this court without objection, exception, or assignment."

To the same effect also is the case of *August* v. *United States* (C. C. A.) 257 F. 388.

We wish not to depart from the rule laid down in this jurisdiction that in ordinary cases on appeal errors relating to instructions or refusing requests to instruct will not be considered or reviewed unless exceptions thereto were properly taken by the party complaining. But in capital cases and in cases of grave and serious charged offenses and convictions of long terms of imprisonment, cases involving the life and liberty of the citizen, we think that when palpable error is made to appear on the face of the record and to the manifest prejudice of the accused, the court has the power to notice such error and to correct the same, though no formal exception was taken to the ruling. In these days of widespread advocacy of reformed procedure in criminal cases to heal and cure misgivings and faulty prosecutions, the safeguards of the rights and privileges of the accused should not be overlooked and a loose rein held for the prosecution and a tight, technical, and restricted rein held on the accused.

In many instances the Legislature already with respect to many rulings in the progress of the trial has abolished the necessity, both in civil and in criminal cases, of taking formal exceptions to rulings, but has not yet gone to the extent of abolishing the necessity of taking exceptions to instructions of the court and of refusing requests to charge. Here, we think, on the face of the record, manifest error was committed by the court in charging the jury on the subject of voluntary manslaughter, the offense for which the accused was convicted, and so misdirected the jury as to the law in such particular as to deprive the defendant of a fair trial. In such case, the state has no right to hold the judgment, and we think it is the clear duty of the court

to notice the error and to correct it. Voluntary manslaughter was an offense necessarily included in the information charging murder in the first degree. It was the duty of the court to charge upon the subject, whether requested so to do or not. That is to say, it was the duty of the court to charge the jury on all of the included offenses involved in the charge and upon the evidence. Without request the court did so. It was required to state the law correctly and not to misdirect the jury in such particular. As is seen in the last portion of the charge italicized, the court used the term or phrase "guilty of murder in the first degree," instead of the phrase "voluntary manslaughter," the subject of the offense to which such charge was directed. It may be and probably was that the misuse of such terms was done inadvertently, and since the jury did not find the accused guilty of murder in the first degree, it may be that the charge in such particular did not mislead the jury. We shall thus consider that the court had intended to use the phrase "voluntary manslaughter," instead of "murder in the first degree," and that the jury so regarded the charge.

We have already considered the elements constituting voluntary manslaughter, and that one of such essential elements is a willful or intentional killing, or the willful and intentional infliction of great bodily harm resulting in death. As is seen, the charge wholly eliminated that essential and dominant element of voluntary manslaughter. In other words, to convict the defendant of voluntary manslaughter, the offense for which the defendant was convicted, the jury were permitted by the charge to do so without finding that the killing was either willful or intentional, thus misdirecting the jury with respect to the elements of the offense for which the accused was convicted.

That such error was manifest and of necessity resulted to the prejudice of the accused and deprived him of a fair trial cannot well be doubted. Because of such manifest error and further because, as already indicated, that the judgment of the court below must be reversed and a new trial granted

upon other grounds, we deem it our duty to notice the error and to correct it, though no exception was taken thereto, in order that on a retrial of the case the same error may not again be committed.

In reaching this result, we are not unmindful of another portion of the charge wherein the court, in defining the offenses of murder in the first and second degree and voluntary manslaughter, charged that "voluntary manslaughter is an intentional killing where the killing is upon a sudden quarrel or in heat of passion." But that is all that the court there stated upon the subject. So far as such charge goes, it was not a misstatement of the law, for there the court recognized that voluntary manslaughter "is an intentional killing" upon a sudden quarrel or in heat of passion. But when the court directed the jury, as was done in the charge complained of, as to the necessary elements to warrant the jury in finding the defendant guilty of voluntary manslaughter, the court eliminated the most essential element of the offense by directing the jury that they could find the defendant guilty of voluntary manslaughter without finding that the killing was either willful or intentional. Though both charges on the subject be considered together, yet it cannot be told which of the two conflicting charges the jury followed, and it is more likely and probable that the jury followed the specific charge and direction as to the elements which the jury were required to find in order to convict the defendant of voluntary manslaughter.

Thus, for the reasons hereinbefore given, the conviction of and the judgment against the defendant are hereby reversed, and the cause is hereby remanded to the district court of Juab county, with direction to grant a new trial.

ELIAS HANSEN, C. J., and FOLLAND, MOFFAT, and WOLFE, J. J., concur.