## STATE v. JENSEN.

No. 7617.   Decided October 16, 1951.   (236 P. 2d 445.)

See 41 C. J. S., Homicide, sec. 328. Intent to kill inferred from use of fists. 26 Am. Jur., Homicide, sec. 306; 15 A. L. R. 675.

*Herbert F. Smart,* Salt Lake City, for appellant.

*Clinton D. Vernon,* Atty. Gen., *G. Hal Taylor,* Deputy Atty. Gen., *Francis C. Lund,* Deputy Atty. Gen., for respondent.

CROCKETT, Justice.

Defendant appeals from a conviction of second degree murder. He asserts that there is not sufficient evidence from which reasonable minds could find beyond a reasonable doubt either (1) that he had the intent necessary to constitute second degree murder or (2) that any act on his part caused the death.

With respect to his intent: It is the established law of this state that in order to make the crime of second degree murder the defendant must have intended to either (a) kill, or (b) do great bodily harm, or (c) do an act which would naturally and probably cause death or great bodily harm to the deceased. *State* v. *Thompson,* 110 Utah 113, 170 P. 2d 153; *State* v. *Trujillo,* 117 Utah 237, 214 P. 2d 626.

In this case, the jury was instructed to that effect. From their verdict, it must be assumed by us that they found from the evidence beyond a reasonable doubt that the requisite intent was present. If the evidence justifies that finding, it is our duty to affirm the verdict. Mr. Justice Gideon for this court in *State* v. *Minousis,* 64 Utah 206, 228 P. 574, 575, stated:

"we have nothing to do with the matter of reconciling conflicts. We are required to uphold the judgment if it appears that there is substantial evidence * * * which would warrant the trial court in submitting the case to the jury."

See also *Pixley* v. *State,* 203 Ark. 42, 155 S. W. 2d 710, and *State* v. *Heinz,* 223 Iowa 1241, 275 N. W. 10, 114 A. L. R. 959.

The inquiry then is: Is there sufficient evidence from which reasonable minds could believe beyond a reasonable doubt that the defendant had the requisite intent for second degree murder as hereinabove set forth.

From the record, it appears that all of the characters in this drama were a good deal below the moral standard which generally prevails in our Utah communities. They had all been drinking together at a dance on the evening prior to this tragedy; both defendant and deceased were drunk. After the dance, the defendant accidentally dropped and lost his car keys and sent his wife for a taxi. The deceased, Val Gene Steele, offered to drive her and her husband home. She got in his car; he drove on past her husband who was standing by his truck and went on to a public park. There is evidence that he made an indecent proposal to her and that he may have been a bit rough in trying to force his attentions on her. He being dead, her version of the story is the only evidence available; she stated that after a short struggle he gave up, drove her back and let her off at her husband's truck. Whatever the episode amounted to, the defendant's wife made no mention of it to her husband that night. She first told him about it the next morning at breakfast. There is no evidence that he was then much concerned or upset about it. At about 8:30 or 9:00 a. m., the defendant left home to see about working that day. On the highway, he met one Sherril Crane who also had a hangover from the previous night; they proceeded to a tavern in Salina to drink beer together. As defendant sat in the tavern drinking beer, he talked volubly about the affront to his wife, telling all the customers about it. This is some indication of what a sensitive creature he must be and how outraged his feelings must have been at the claimed insult to his wife. Defendant and Crane spent most of the forenoon in the tavern. Defendant boasted several times, referring to Steele, that he was going to "kill the son of a bitch" and "beat him to death." He did this in the hearing of numerous people; the

tavern operator told the defendant that he "would not be talking about it in a public place." Sherril Crane, the so-called friend of the defendant, kept urging the defendant on to start some trouble.

It should be remembered that the defendant was a big, strong man, practically in the prime of life. He weighed 180 pounds, was 5′ 10″ tall, and 34 years old. The deceased was a much smaller and considerably older man. He weighed 130 to 135 pounds, was 5′ 5″ tall and was 41 years of age. Even if one tolerated the idea of physical violence as a method of rectifying a wrong, it would have been un-sportsmanlike for this larger, younger man to administer a beating to the deceased. But the evidence supports a finding of a more serious determination. Several witnesses testified to hearing the defendant make unconditional threats to kill the deceased. Finally, just before noon, the defendant told this Crane to go get the deceased and he, the defendant, would kill him. Defendant allowed Crane to take the defendant's truck for that purpose. Crane lied to the deceased, presuming on his friendship to ask him to help Crane move a refrigerator. This deceased readily agreed to do, relayed this information to his wife, got in the truck and went with Crane. The latter then took the deceased to the tavern; parked the truck and got out of it; then went and informed the defendant that Steele was there, thus laying the scene for this crime. One can visualize how proud Crane must be of the part he played in this affair which resulted in the death of deceased, leaving as a widow a trusting wife and mother and causing five small children to be fatherless.

Upon learning that the truck was in front of the tavern —the defendant took off his shirt, went out and tried to get the deceased out of the truck. In doing so, he again expressly threatened to kill the deceased. The deceased only attempted to keep in the truck and avoid being taken out of it by the defendant. The latter got up on the running board and proceeded to flail upon the deceased, who was

then lying in the seat trying to keep away from the defendant, the most vicious and violent blows he was capable of.

As the witnesses could not actually see into the cab of the truck, no one was in a position to tell whether defendant was striking Steele with anything but his hands; we assume that all of the blows were struck with his bare fists. After defendant had rained many blows upon the deceased, one Sharp Rasmussen, a bystander, stopped the defendant. As he did so, the defendant was still threatening to kill Steele and continuing to call him names. Ernest Lau, who knew the deceased well, got up on the running board and looked into the truck; the deceased was so bruised and bloody that Lau did not recognize him and inquired who he was; Lau testified that "there was blood all over." A few minutes later, after deceased had washed and cleaned up as best he could, when Crane let him off at his home, his wife noticed "a deep gash in his mouth," "a large black mark on his temple," "his eyes swollen" and other marks of violence upon him. He seemed not to know what was going on—, kept asking the same questions about the World series ball game which was on the radio,—walked out into the yard—and within a few minutes one of the children observed him lying on the ground gasping his last. Although there is some uncertainty about the time, his death occurred within two hours (with a possible variation of a few minutes either way) of the time of the assault upon him. Any difference in facts between this and the dissenting opinion is because Mr. Justice WADE is placing some emphasis on certain of defendant's evidence, while we rely on the evidence produced by the State.

Is the foregoing evidence sufficent to meet the requirements of the law as to the intent necessary for second degree murder? The question of intent is practically always one for the jury; that universally accepted principle of law is well stated for this court by Mr. Justice █ Folland in *State* v. *Martin*, 78 Utah 23, 300 P. 1034. This same rule is also asserted without qualification in Vol.

3, Warren on Homicide, Perm. Ed., p. 307, citing many authorities including *State* v. *Minousis,* supra.

It is true that striking with fists, without more, will not ordinarily imply an intent to kill. *McAndrews* v. *People,* 71 Colo. 542, 208 P. 486, 24 A. L. R. 655. See *People* v. *Crenshaw,* 298 Ill. 412, 131 N. E. 576, 15 A. L. R. 671, and authorities cited in connection with the A. L. R. report on that case and note following it. But at p. 676, the annotator says,

"* * * It has been held that an assault without a weapon may be attended with such circumstances of violence and brutality that an intent to kill will be presumed."

See cases there abstracted so holding. Under that rule, the violence and brutality of the attack in this case, coupled with the difference in the sizes and ages of the men and the other circumstances, was such that the court may very well have submitted the question of the defendant's intent, even if the defendant had made no threat nor expression of his intention. However, that is a matter which we need not consider nor pass on. Here the defendant not only expressly stated his intent beforehand to kill the deceased, but sent for him for the avowed purpose of carrying out his threat.

It is uniformly held that it is not necessary that a deadly weapon be used in order to justify a finding by the jury that a defendant intended to kill. In addition to the cases contained in the note at 15 A. L. R. 676, referred to above, see also *Bearrow* v. *State,* 135 Tex. Cr. R. 119, 118 S. W. 2d 594, where the killing was by choking and the court stated that it was not necessary that the defendant use a deadly weapon in order to show a murder with malice; in *McArthur* v. *State,* 132 Tex. Cr. R. 447, 105 S. W. 2d 227, death by choking and beating was held to support a conviction of murder. In *Pixley* v. *State,* supra, the defendant, a woman, beat another woman with her fists.

In affirming a conviction of voluntary manslaughter, the court said [203 Ark. 42, 155 S. W. 2d 713],

"the cold fact remains that appellant did beat Mary Pixley to death with her fists, and, as we have indicated, the jury was warranted in finding that she intended the consequences of her acts."

For other similar holdings, see *State* v. *Clark,* Mo. Supp., 111 S. W. 2d 101; *State* v. *Carter,* 345 Mo. 74, 131 S. W. 2d 546; *Comm.* v. *Lisowski,* 274 Pa. 222, 117 A. 794; *Comm.* v. *Guida,* 298 Pa. 370, 148 A. 501; *State* v. *Heinz,* 223 Iowa 1241, 275 N. W. 10, 114 A. L. R. 959.

The facts in *State* v. *Cobo,* 90 Utah 89, 60 P. 2d 952, relied on by defendant, were greatly at variance with the facts in this case. The deceased, one McIntyre, insisted upon entering and creating a disturbance in Cobo's home against the will of the latter; there was an actual fistic encounter between them in which it may be said that Cobo was practically defending the peace and quiet of his home; the sizes of the two men were just reversed to the instant case; Cobo made no threat whatsoever prior to the encounter but did make a braggadocio remark after he had taken care of the unwelcome intruder. The court correctly held that there was insufficient evidence to show intent to kill or to do serious bodily harm requisite to support a charge of murder or voluntary manslaughter.

Defendant asks us to theorize that in threatening to kill Steele he did so in a manner of "big talk" or "bragging." The jurors saw and heard the witnesses, including the defendant himself. Because they are closer to the actuality, the flesh and blood and drama of the crime and the trial, they are in a much better position than is this court to determine what defendant's intent was. The jury was composed of presumably fair-minded citizens of the locality, properly selected and fully and accurately

instructed by a conscientious and careful trial judge. Respecting the matter of the intent, his instruction was:

"Before you can find the defendant guilty of murder in the second degree, you must believe from the evidence beyond a reasonable doubt the following:

"First   *   *   *
"Second   *   *   *
"Third   *   *   *
"Fourth   *   *   *
"Fifth   *   *   *

"Sixth: That the killing was the result of the specific intention on the part of the defendant to take the life of said Val Gene Steele or with specific intention of committing the alleged unlawful act with the knowledge that the natural and probable consequences thereof would be to cause death or great bodily harm to said Val Gene Steele."

That instruction correctly states law as to the intent required in second degree murder.

There could hardly be more direct or certain evidence of the defendant's intent than for him to declare before, during and after the attack, his intention to kill. However, we do not disagree with the idea that the jury could have weighed against it the fact that the defendant (apparently) only used his fists, and if there were any reasonable doubt in their minds as to his intention to kill or do great bodily harm to Steele, then the verdict could not have been for more than involuntary manslaughter. On the other hand, they were also entitled to consider the evidence of the difference in the sizes and ages of the men; the brutality of the attack and the expressed threats of the defendant to kill the deceased. Under that evidence, the trial court was required to allow the jury to determine what his intent was. If they chose to believe that he meant what he said, and found from the evidence beyond a reasonable doubt that he did intend to kill or do great bodily harm to the deceased, it was their privilege so to do. There was evidence upon which reasonable minds

could conclude as they did, and this court will not disturb their verdict.

Defendant's further attack on the judgment is that the evidence was insufficient to establish that Steele died as a result of any act of the defendant. He asserts: "There is no evidence to show that the defendant struck any blow on the temporal region of the deceased." As above recited, witnesses testified that they saw defendant striking violent blows upon the deceased; they were not in a position to see exactly where they landed. Defendant did not deny, and in fact testified at the trial, that he "struck a few blows" upon the deceased. After Steele had died, the defendant went to Mrs. Steele and said among other things: "I done it—and I'm sorry." It certainly was permissible for the jury to infer from the facts shown that the blows struck included the blow to his "right temporal region" which caused the discolored swelling on his temple. See Warren on Homicide, Vol. 3, Perm. Ed., Sec. 275, and cases there cited holding that direct testimony of the actual blow causing death is not necessary. In the case of *Lanergan* v. *People,* 50 Barb., N. Y., 266, 34 How. Prac. 390, it was held that the guilt of the defendant was sufficiently proved by evidence that the defendant and the deceased, his wife, were alone in a room, blows were heard, and she was subsequently found dead and he was seen leaving the room. Were it necessary in every homicide case to prove by direct evidence that the fatal blow to deceased was actually struck by the defendant, many guilty persons would escape punishment. The test the law imposes is that the facts proved convince the jury beyond a reasonable doubt that the defendant committed the act.

As a to the matter of the death resulting from the blow: It was shown that the deceased was in good health and had no injury prior to the fight. Immediately afterward he had numerous wounds including the "large black mark on his temple." Dr. John Cluff, a medical doctor, testified that the cause of death was acute cranio-cerebral trauma and

that the blow over the right temporal region was the fatal blow. The fact that some three and a half months after the death, the body of the deceased was exhumed and a pathologist testified that he could not then find any evidence of cerebral hemmorhage and that from his examination the cause of death was undetermined, does not necessarily directly disagree with the testimony of Dr. Cluff. Even if it did, it would only create a conflict in the evidence.

There was abundant competent credible evidence upon which the jury, acting as reasonable persons, could find beyond a reasonable doubt that a blow struck by defendant was the cause of death and that the defendant had the intent necessary to make out the crime of murder in the second degree. The defendant had a fair trial, he was represented by able counsel. The trial court fully and accurately instructed and presented the issues of fact to a jury of defendant's fellow citizens. They, after hearing all of the evidence and the law applied thereto, found him guilty of murder in the second degree.

The conviction is affirmed.

WOLFE, C. J., and McDONOUGH, J., concur.

WADE, Justice (dissenting).

I conclude that it is unreasonable under the facts and circumstances of this case as disclosed by the record to find that there is no reasonable doubt of defendant's intention to either kill decedent or do him great bodily harm or to do an act knowing that it naturally and probably would do decedent great bodily harm. I use the phrase "unreasonable to find that there is no reasonable doubt" rather than the conventional phrase "no reasonable mind can find beyond a reasonable doubt" because I think it more accurate. Our problem is whether the result reached is reasonable not whether the mind which reaches that result should be classified as a reasonable mind. Most minds act reasonably

most of the time, very few always so act, unless the phrase "reasonable mind" means a mind which never acts unreasonably then its use in describing this concept is inaccurate for such a mind might act unreasonably in the instant case although in all other cases it might act reasonably.

I think the picture against the defendant is greatly overdrawn in the prevailing opinion so I make my own version of the facts as disclosed by the record.

On the evening of October 7, 1949, decedent and defendant and his wife were at a ball in Salina, Utah, and decedent and defendant were both somewhat intoxicated. When the dance closed, defendant and his wife went to his truck to drive home but he accidently dropped and lost the car key and while he searched for it he sent his wife to Mom's Cafe to get a taxi. While she was waiting for one, decedent came in and sat beside Mrs. Jensen and after some conversation she accepted his offer to drive her and her husband home in his car. However, when she got in his car he drove past her husband and his truck without picking him up and went on to a public park where he proposed intercourse which she refused and he struck her between the eyes with his fist. After a short struggle he gave up and then let her off at her husband's truck where in the meantime defendant had found the keys, and they drove home.

Mrs. Jensen first told her husband of decedent's attack the next morning and he became upset about it. About 8:30 or 9:00 a. m., defendant left home to see if he had work but on the way he met Sherill Crane who also had a hangover from the previous night and they proceeded to Jack's Knotty Pine Inn, in Salina, where they drank beer together. Soon defendant told the people there of decedent's attack on his wife the previous evening, that he deserved a beating and should be made to apologize and Crane drove defendant's truck to decedent's home and brought him back

to the Inn. There defendant told decedent to get out of the car, and there is evidence that he demanded an apology for the attack on his wife, and threatened to beat him to death if one was not forthcoming. Decedent refused to get out of the truck and defendant stood on the running board and proceeded to attack decedent through the open door with his fists. To ward off the blows, decedent drew his feet upon the seat between his face and defendant and his head went partially down on the seat and defendant grabbed decedent's feet and started to pull him out of the truck when Sharp Rasmussen who had been drinking with defendant that morning took defendant by the arm and said he had been beaten enough. Thereupon defendant ceased the attack but continued in a loud voice to demand an apology to his wife and repeatedly said if he did not do so he would kill decedent. At first decedent asked for a little time but later agreed to go to her home immediately and make the apology. Thereupon, Crane drove him in defendant's truck to defendant's home where decedent apologized to her and they brought Mrs. Jensen back with them to the Inn where he again apologized to defendant and his wife alone at the truck. Then Crane took decedent back home and on the way they stopped by the road and drank a bottle of beer.

The encounter between defendant and decedent occurred a few minutes after 12:00 in the busiest part of Salina on a Saturday. It was witnessed by customers and waiter of the Inn and a number of people on the street. Before the encounter, decedent was in good health and his face unmarred. After the altercation, he did not appear to be badly hurt although his face had a number of bruises and was bleeding from a laceration on the lower right lip and an abrasion on his right brow, and there was evidence of contusions over his right jaw, the right side of his nose and right cheek and ear and a more severe contusion with swelling on his right temporal region. To me it seems quite probable decedent's injuries resulted from bumping against

the sides of the truck cab rather than from direct blows of defendant's fists for in such a small compartment with a steering wheel between them and decedent trying to avoid the blows it would be difficult to do the damage which resulted. The encounter lasted from less than a minute to possibly a minute and a half. Defendant started the encounter largely at the suggestion of others and stopped when he was told he had done enough. Defendant was 34 years old, he said he weighed between 155 and 165 pounds, and he was 5 feet 10 inches tall; another witness called by defendant estimated that he weighed about 180. Decedent was nearing 42 years of age, weighed about 135 pounds and was 5 feet and 5 inches tall. Decedent was away from his home less than an hour. When he returned home, there was no evidence he was seriously injured. Shortly after he returned, he began to be restless and said to his wife that he was not well, and appeared to be going to bed, then went outside and before 3:00 o'clock he was found unconscious and was dead before a doctor arrived.

There was nothing about defendant's attack on decedent which indicated an intention to kill or do great bodily harm, nor was his death the natural and probable result thereof. It is true that defendant said he would kill him or beat him to death if he did not apologize, but that was qualified on condition that decedent refused to apologize, and it was said more in a manner of big talk rather than as indicating an intention to carry it out literally. It is not uncommon for people to make such statements without meaning to carry them out. There is nothing to indicate that defendant was particularly violent in his attack on decedent. He seems to have thought as most husbands would think that decedent deserved a thrashing. He was a larger and younger man than decedent but this difference is not so great that it would suggest that this short encounter would result fatally or in great harm to decedent. There is no evidence that he took unfair advantage or that he unduly persisted in punishing decedent or that at any time dur-

ing the scuffle decedent was in a helpless condition. No one suspected that decedent was badly hurt until he suddenly died. Under these circumstances, it would be unreasonable to conclude that there was no reasonable doubt that he had the necessary intention to constitute murder in the second degree.

Most courts recognize that in a case of striking only with the hands and fists, without extraordinary circumstances which indicated an intention to kill or do serious bodily harm, the evidence is not sufficient to sustain a verdict of first or second degree murder. *People* v. *Crenshaw,* 298 Ill. 412, 131 N. E. 576, 15 A. L. R. 671; *People* v. *Mighell,* 254 Ill. 53, 98 N. E. 236; *People* v. *Munn,* 65 Cal. 211, 3 P. 650, 651, 6 Am. Crim. Rep. 431. In the last case, the court said:

"In the trial of cases of homicide committed by violence it is almost always important to consider the character of the weapon with which the homicide was committed, and all through the cases great emphasis is laid on the fact that a weapon likely to produce death was used by the accused. If the means employed be not dangerous to life, or, in other words, if the blows causing death are inflicted with the fist, and there are no aggravating circumstances, the law will not raise the implication of malice aforethought, which must exist to make the crime murder."

These cases recognize that the circumstances may be such as to evidence an intention to kill or do great bodily harm even though no weapon other than the fists is used, and there is a line of cases which so hold. See note to 15 A. L. R. 675, and 24 A. L. R. 666, but the facts in those cases are not similar to this case.

In *State* v. *Cobo,* supra, we held that even voluntary manslaughter requires an intent to kill or do great bodily harm or the doing of an act which will naturally and probably have such effect, and that striking with fists in a fair fight does not have a tendency to show such an intention. In view of this decision, the only crime which defendant could be guilty of under this evidence is involuntary manslaughter.

If we mean what the phrase "convinced beyond a reasonable doubt" says then the evidence must be sufficient to establish defendant's guilt including his intent, so conclusively that the trier of the facts could reasonably conclude that any doubt thereof would be unreasonable, for as long as a contrary conclusion is reasonably possible under the evidence then there is a reasonable doubt. See Wigmore on Evidence, 3d Ed., Sections 2497 and 2498. I think it would be unreasonable to conclude from this evidence that to find that defendant did not intend to kill, cause great bodily harm or do an act knowing that it would probably cause decedent great bodily harm would be unreasonable.

I therefore dissent.

HENRIOD, J., did not participate.