STATE of Utah, Plaintiff and Respondent,

v.

Ray DIRKER, Defendant and Appellant.

No. 16319.

Supreme Court of Utah.

April 4, 1980.

Robert J. Schumacher of Utah County Legal Defenders Assn., Provo, for defendant and appellant.

Robert B. Hansen, Atty. Gen., Earl F. Dorius, Asst. Atty. Gen., Salt Lake City, for plaintiff and respondent.

STEWART, Justice:

Defendant, Ray Dirker, appeals from his conviction under § 76–6–410(1)(a),[1] which in pertinent part reads as follows:

A person is guilty of theft if:

(a) Having custody of property pursuant to an agreement between himself or another and the owner thereof whereby the actor or another is to perform for compensation a specific service for the owner involving the maintenance, repair, or use of such property, *he intentionally uses or operates it, without the consent of the owner, for his own purposes* in a manner constituting a gross deviation from the agreed purpose . . .. [Emphasis added.]

Defendant contends that the instructions should have included a requirement of "intent to deprive" in order to establish the necessary criminal conduct for a theft conviction.[2] However, we do not reach that

---

1. All statutory references are to Utah Code Annotated (1953), as amended.

2. At trial, the court instructed the jury that the essential elements of the crime charged are as follows:

1. That the defendant obtained custody of an operable 1974 Porsche automobile belong-

issue but reverse for the reason that the statute does not prohibit the conduct of the defendant as charged in the information. Although this issue has not been raised on appeal, it is our duty to address it in any event to prevent a manifest miscarriage of justice. *State v. Cobo*, 90 Utah 89, 60 P.2d 952 (1936).

Sometime about the first of November 1977, Ray Dirker contacted Joel Murphy, a used car salesman who worked for a dealership in Provo, Utah. According to Murphy, Dirker offered to repair a 1974 Porsche 914 automobile that had previously been involved in a wreck and was then sitting on the dealership parking lot.

Although Dirker had previously been employed by a body repair shop, at the time of this conversation Dirker had his own business, which he operated out of Wheels West, in the same general location as the dealership with which Murphy was associated. Dirker offered to locate replacement parts and to perform all the labor necessary to complete the repairs in exchange, according to Murphy's testimony, for "use of the car for means of transportation." Murphy had on previous occasions entrusted two Porsche automobiles and a jeep to Dirker for repair and had been satisfied with the work done by him. Murphy knew that Dirker lived away from his business and had no transportation of his own. In view of Dirker's past conduct, Murphy felt this "would be a safe deal."

At trial, Murphy and Dirker disagreed on the exact nature of their agreement. Dirker contended that he was authorized to use the car for his personal use and not just for transportation to and from work. Murphy stated that he had told Dirker that he did not want the car driven in a state of disrepair because the more it was seen in that condition, the more difficult resale would be; therefore, it was Murphy's position that he had agreed only to Dirker's use of the car as a means of transportation to and from work. In any event, the evidence is undisputed that the agreement contemplated some personal use by the defendant. Murphy said that he told Dirker that no one else was to drive the car. They did agree essentially that Dirker first offered to do the repairs and limit his use of the Porsche to a two or three-week time period. Murphy, however, extended this time, telling him that he thought it would be reasonable for Dirker to take as long as 30–60 days to complete the work. Uncontroverted at trial was the evidence indicating the value of Dirker's labor for doing the repair work was $1,000.

On or about December 15, Dirker drove to a private club in Spanish Fork where his girlfriend was employed. He met her there late in the evening and together they drank some alcoholic beverages. Around 1:00 a.m., Dirker and his girlfriend left the club to drive home. Because the jeep was more difficult to drive than the Porsche, and because his girlfriend was tired, Dirker drove the jeep and let his girlfriend drive the Porsche. According to the girl's testimony, Dirker drove ahead of her "going really slow," and she, driving too fast, drove the Porsche into the rear end of the jeep. As a result of the collision, the jeep had to be towed away, and the Porsche was inoperable for highway use. In addition, the girl required medical attention.

ing to Joel Murphy under an agreement that he perform for compensation repair services on it.

2. That the defendant intentionally used the vehicle for his own purposes.

3. That said use was a gross deviation from the agreement for which he was given custody of the said vehicle.

Dirker's counsel objected to this instruction and requested the following instruction:

The essential elements of the crime charged in the Information are as follows:

1. That the defendant obtained custody of a 1974 Porsche auto vehicle belonging to Joel Murphy under an agreement that he perform for compensation repair services on it.

2. That the terms of such agreement were that he was not to drive or otherwise use the vehicle for his own purposes.

3. That the defendant did use the vehicle for his own purposes and such use constituted a gross deviation from the agreed purpose for which he was given custody of the said vehicle, and that such use was without the consent of the owner; and with the intent to deprive the owner of such vehicle.

Immediately following the collision, Dirker, in an effort to clear the area, drove the Porsche into a field next to the road. The car was badly damaged. The front wheels were smashed in from the impact, the engine dropped to the ground, the transmission stuck in first gear, and the tires rubbed when Dirker drove it off the road. The car could not be towed in the usual manner because of the nature of the damage, and Dirker left it in the field for about two weeks until he arranged to have it towed away by a trailer.

Murphy testified that he first learned about the incident from a member of the American Fork Police Department, who contacted him to inform him that the car was in the field. It is unclear exactly when this contact was made, although Murphy testified that it was between December 12 and 16. In any event, Murphy testified that Dirker did not personally notify him about the collision and that it was he, Murphy, who sought out Dirker to discuss the matter but was not able to talk with Dirker until about a week after the police had telephoned him.

When confronted by Murphy, Dirker told him that the car had been involved in an accident, but that he had talked with an automobile repairman by the name of Murdock who was going to repair the damage. Murdock testified at trial that he had been contacted by Dirker about the collision and that he had gone to see the car to estimate the damage. Murdock originally told Dirker that the cost to repair the car with new parts would be $2,500 and that he did not think it was worth fixing.

Murphy told Dirker that he had seen the car and knew the damage was extensive. Dirker then relayed how the accident occurred and that his girlfriend had been driving the Porsche. Dirker and his girlfriend, who was also present during this conversation, both assured Murphy that they would compensate him for the damages to the car. Murphy eventually contacted Murdock to verify what Dirker had told him. Although it is unclear when the two men first spoke with each other, Mur-

dock confirmed to Murphy that Dirker had made arrangements to take care of the automobile.

Dirker contacted Murdock again, according to Murdock, and told him that he was concerned about the car being stripped and that he, Dirker, wanted Murdock to repair it. They went over Murdock's estimate again, and Dirker indicated that he could get used parts which would be cheaper than new ones. On that basis Murdock agreed to repair the car.

Sometime in February or the first of March 1978, Murphy contacted the county sheriff's office and lodged a complaint against Dirker. The criminal complaint was prepared March 2, 1978. As of that date Murdock had not begun repair of the car.

■ The purpose of § 76-6-410(1)(a) is not to punish a person who obtains lawful consent of the owner to use his property for personal purposes when the person who obtains the property does so but departs from the terms of the agreement. Section 76-6-410(1)(a) contemplates that there be an entrustment or bailment of one's property to another pursuant to an agreement whereby one is "to perform for compensation a specific service *for the owner* involving the maintenance, repair or use of such property." The statute assumes that the property may be used by the custodian for purposes properly related to the purpose of the entrustment; only a use that constitutes "a gross deviation from the agreed purpose," without express consent for personal use, is a crime. The statute appropriately fits, for example, the circumstances of a bailment where one places his automobile in a garage for repair or maintenance. To insure successful completion of the work, a repairman may need to road test the car. Consent for that purpose is implied by the statute because that use is clearly for the owner's benefit. In the ordinary course of affairs, a repairman's personal use of the automobile, which is not authorized by the owner, would fall within the scope of the statute, if the personal use constituted a "gross deviation" from the terms of the bailment agreement.

■ A person who has consent to use the property for his own personal purposes, unrelated to the purpose of the entrustment, does not violate the statute if he uses the property in a manner that goes beyond the terms of the consent. Although some dispute exists over the specific terms of the agreement between Dirker and Murphy in this case, the owner specifically granted personal use of the car to the defendant as compensation for repair services to be rendered during an unspecified period of time. Perhaps the defendant exceeded the terms of the agreement,[3] depending upon whether Dirker's or Murphy's testimony is credited, but if Dirker exceeded the consent, he did not thereby become criminally liable.

■ The repair agreement in the case at hand is somewhat unusual in that personal use was specifically granted as the sole means of compensation. The owner of the vehicle was not under any obligation to enter into such an agreement. He was free to create an agreement to his own satisfaction. The owner not only consented to personal use, but he apparently set forth no specific time for the return of the automobile. Further, it appears he made no specific demand for the return of the automobile with which the defendant refused to comply. Therefore, any unauthorized use would result in liability for damages flowing from breach of contract for use "without consent."[4]

Interpreting statutory language substantially similar to § 76–6–410(1)(a), other courts have held that use in excess of a consent is not necessarily criminal in nature. In *State v. Mularkey*, 195 Wis. 549, 218 N.W. 809 (1928), the defendant, after using a car for a period exceeding the length of the rental agreement, abandoned it without notice to its owner. He was convicted under a statute which penalized the taking, use, and operation of an automobile "without owner's consent." The court reversed the conviction, and held:

. . . the mere unauthorized or extended use of such a vehicle by one who has lawfully obtained the consent of the owner to its taking for use and operation upon the public highway is not a violation of this statute . . . . 218 N.W. at 810.

In *People v. Alaboda*, 198 A.D. 41, 189 N.Y.S. 464 (1921), the defendant, after having used a rented car beyond the time limit of the agreement, was found guilty of larceny under a statute which prohibits the use or operation of an automobile for one's own profit, use, or purpose without the consent of the owner. The judgment was reversed. The court stated that

. . . there has been no purpose on the part of the Legislature to deal with a case in which the person has come into possession of the property for his own purposes with the consent of the owner. The statute has full scope for useful operation when it is applied to the mischief sought to be remedied, without extending it to cases which were obviously not within the contemplation of the Legislature. 189 N.Y.S. at 466.

In *United States v. McLaughlin*, 278 F.Supp. 320 (D.C.D.C.1967), the defendant rented an automobile for two days. The car was found by the police two months later in front of defendant's home, and defendant was convicted under a statute which provided:

Any person who, without the consent of the owner, shall take, use, operate, or

---

3. In view of our disposition of this case, we do not reach the merits of the contentions raised by defendant. Defendant's other claims are: (1) that there was insufficient evidence that the person with whom the defendant had the agreement was the actual owner of the automobile; (2) that the trial court erroneously admitted evidence that the defendant was intoxicated at the time of the theft; and (3) that the sentence imposed under § 76–6–412 is greatly disproportionate to the offense allegedly committed and is violative of the Eighth Amendment to the United States Constitution.

4. If, while exercising unauthorized control, one evidences a purpose to deprive the owner thereof, a conviction for theft would be appropriate under § 76–6–404, which reads: "A person commits theft if he obtains or exercises unauthorized control over the property of another with a purpose to deprive him thereof."

remove, or cause to be taken, used, operated, or removed from a garage, stable, or other building, or from any place . . an automobile or motor vehicle, and operate or drive or cause the same to be operated or driven for his own profit, use, or purpose shall be punished . . . .

*Id.* at 321.

The court held that defendant's use, although in excess of authority, did not constitute use "without the consent of the owner" within the meaning of the statute and accordingly reversed the conviction. The court noted that the rental agency, having been under no obligation to rent the car to the defendant, and having done so voluntarily and under its own terms, could have recovered the car and the appropriate monetary compensation by means of civil process.

■ Use of the words "uses or operates" in § 76–6–410(1)(a) supports the conclusion that defendant's permitting his girlfriend to drive the car was not prohibited by the statute. The disjunctive use of those words connotes a distinction between the "use" of custodial property by the one granted custody and the "operation" of such property. *Feitelberg v. Matuson*, 124 Misc. 595, 208 N.Y.S. 786, 789 (1925). The word "use," in contradistinction to the word "operate," indicates that, with respect to an automobile, one may properly use the automobile even though he is not the driver, at least in a case where there is a good reason for someone else to drive. The term "operate," on the other hand, designates the personal act of working the mechanism of the automobile. *Polyak v. Israelson*, 348 F.Supp. 529, 531 (D.C.Pa.1972); *Witherstine v. Employers' Liability Assur. Corporation*, 235 N.Y. 168, 172, 139 N.E. 229, 230 (1923).[5] The fact that defendant, in the instant case, allowed his girlfriend to drive the car is not inconsistent with the initial consent to "use" the car for personal use.

Our conclusion is that defendant was convicted for acts that do not constitute a

crime. It is our duty, therefore, to remand the case to the trial court with instructions to set aside the conviction and dismiss the information.

MAUGHAN, WILKINS and HALL, JJ., concur.

CROCKETT, Chief Justice (dissenting):

I do not want to appear to be unappreciative of the earnest and sincere efforts made on behalf of the defendant to exculpate him from the crime of which he stands convicted. But my judgment impels me to the contrary conclusion.

This being a lone dissent, I spare extended exposition and note briefly thus: I confess my inability to appreciate the nicety of distinction in dividing the agreement between defendant Dirker and Mr. Murphy into two separate agreements: one for repair, and one for personal use. According to the evidence as believed by the jury and the trial court, they had but one agreement, which falls within the specific terms of the statute Sec. 76–6–410(1)(a), "involving the maintenance, *repair, or use* of such property . . . . ."

The court correctly so instructed the jury and also properly left to the jury the determination of whether defendant's conduct constituted "a gross deviation" from the agreement. Reading of the defendant's requested instruction will show that it was in error in including defensive elements not covered by the statute, and that the trial court therefore properly refused to give it. I think that the defendant was properly convicted of violation of the statute and that the judgment should be affirmed.

---

5. Technically, the term "uses or operates" applies only to the kind of bailment contemplated by § 76–6–410(1)(a), and not to an agreement outside the scope of that provision, as in the instant case. Nevertheless, the agreement with Dirker was to allow him to "use" the car. The cases cited in the text and the statutory language clarify the meaning of that term.